**PERFECT 10, INC., Plaintiff,**

v.

**CYBERNET VENTURES, INC., et al., Defendants**

**No. CV 01–2595LGB(SHX).**

United States District Court, C.D. California.

April 22, 2002.

As Amended Aug. 13, 2002.

---

Jeffrey N. Mausner, Laurence M. Berman, Berman, Mausner & Resser, Ronald L. Johnston, John J. Quinn, Sean Morris, Daniel J. Cooper, Arnold & Porter, Los Angeles, CA, for Perfect 10, Inc.

Alejandro N. Mayorkas, James P. Jenal, Elyssa M. Getreu, Dawn Sestito, O'Melveny & Myers, LLP, Los Angeles, CA, for Laith Alsarraf.

Christopher G. Caldwell, Michael J. Proctor, Kenneth J. Kao, Caldwell, Leslie, Newcombe & Pettit, Los Angeles, CA, for Cybernet Ventures, Inc.

## ORDER GRANTING PERFECT 10'S MOTION FOR PRELIMINARY INJUNCTION

BAIRD, District Judge.

## I. INTRODUCTION

This action springs from Perfect 10, Inc.'s ("Perfect 10") allegations that defendant Cybernet Ventures, Inc. ("Cybernet"), a corporation running a web-service called "Adult Check," and other defendants infringe Perfect 10's copyrights, violate Perfect 10's trademark rights and otherwise engage in rampant unfair business practices.

Currently before the Court is Perfect 10's Request for a Preliminary Injunction, which requests relief against a variety of defendants. The Court has received Perfect 10's motion, defendants Cybernet and Laith Alsarraf's oppositions, and Perfect 10's reply. These briefs are supported by voluminous supporting papers (and the accompanying evidentiary objections).

## II. INITIAL EVIDENTIARY OBJECTIONS

In support of its motion for a preliminary injunction, Perfect 10 submitted 117 exhibits attached to the declaration of Norman Zadeh, Ph.D. ("Zadeh Decl."), 16 exhibits attached to the declaration of Daniel Farmer ("Farmer Decl.") and 13 exhibits attached to the declaration of Jeffrey Mausner ("Mausner Decl."). Perfect 10 supplemented these declarations with several others. Cybernet basically objects to every exhibit attached to the Zadeh and Farmer declarations, as well as two exhibits attached to the Mausner declaration. In addition Cybernet has raised objections to portions of declarations filed by Zadeh, Farmer, Mausner, Laurence Rudolph ("Rudolph Decl."), Selma Rubin ("Rubin Decl.") and John Baruck ("Baruck Decl.").

Perfect 10 has also raised objections to evidence submitted by Cybernet. Perfect 10 objects to a single paragraph in the declaration of Timothy Umbreit ("Umbreit Decl.") and to ten paragraphs in the declaration of Frederick Lane III ("Lane Decl."). Before the Court makes its findings of fact under Federal Rule of Procedure 65, it will address these objections. It will do so, however, only in broad strokes.

## A. AUTHENTICATION OBJECTIONS

The great bulk of Cybernet's objections center on Perfect 10's exhibits printed off of the internet. See Cybernet Evidentiary Objections ("Def.Obj.") at 1–5. Cybernet argues these exhibits are insufficiently authenticated. See, e.g., id. at 1. In support, Cybernet points to two cases, United States v. Jackson, 208 F.3d 633, 637 (7th Cir.2000), cert. denied, 531 U.S. 973, 121 S.Ct. 416, 148 L.Ed.2d 321 (2000), and St. Clair v. Johnny's Oyster & Shrimp, Inc., 76 F.Supp.2d 773, 774 (S.D.Tex.1999).

The Jackson court upheld the exclusion of certain web postings attributed to white supremacist groups because they were insufficiently authenticated. 208 F.3d at 638. As the court viewed the situation, the criminal defendant in the case had to show that the postings, in which these groups appeared to claim responsibility for a series of racist mailings, actually were posted by the groups, as opposed to being slipped on the groups' web sites by the defendant, who was a skilled computer user. Id.

The St. Clair court took a more extreme view over the admissibility of data taken from the United States Coast Guard's online vessel database concerning the ownership of a vessel. 76 F.Supp.2d at 774. The court viewed the internet as "one large catalyst for rumor, innuendo, and misinformation," stated that there was "no way" the plaintiff could overcome "the presumption that the information ... discovered on the Internet is inherently untrustworthy." Id. The court then excluded the information as hearsay, rather than "relying on the voodoo information taken from the Internet." Id.

Although these out-of-circuit cases are informative concerning the potential pitfalls of internet-based documents, this Court must look to the Ninth Circuit for guidance. In United States v. Tank, 200 F.3d 627, 630 (9th Cir.2000), the Ninth Circuit addressed the admissibility of cer-

tain chat room logs. In *Tank,* the government initiated a prosecution against a child pornography suspect after a search of another suspect's computer files revealed "recorded" online chat room discussions among members of an internet club focused on discussing, trading, and producing child pornography. 200 F.3d at 629. The recorder of these chat room discussions had deleted from his computer non-sexual conversations and extraneous material, such as date and time stamps. *Id.*

The *Tank* court observed that the foundational requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *See* 200 F.3d at 630 (citing Fed.R.Evid. 901(a)). This burden is met when "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity." *Id.* (citations omitted). This burden was met where the producer of the logs explained how he created the logs with his computer and stated that the printouts appeared to be accurate representations. *Id.* Additionally, the government established the connection between Tank and the chat room log printouts. *Id.*

■ The Court finds that Zadeh's declaration adequately establishes the prima facie case for admissibility in claiming the exhibits attached to his declaration were either:

1) true and correct copies of documents produced by Cybernet in discovery (identified by a CV prefix);

2) true and correct copies of pictures from Perfect 10 Magazine or from Perfect 10's website; or

3) true and correct copies of pages printed from the Internet that were printed by Zadeh or under his direction.

Zadeh Decl. ¶ 7. Those webpages that fall under category (3) contain the internet domain address from which the image was printed and the date on which it was printed. Id. ¶ 8.

The first category is covered by *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 889 n. 12 (9th Cir.1996) (discovery documents deemed authentic when offered by party-opponent). *See also Orr v. Bank of America, NT & SA,* 285 F.3d 764, 770–71, 777 n. 20 (9th Cir. 2002) (citing to same). The second and third categories have met the *prima facie* burden because the declarations, particularly in combination with circumstantial indicia of authenticity (such as the dates and web addresses), would support a reasonable juror in the belief that the documents are what Perfect 10 says they are. *See Tank,* 200 F.3d at 630. Moreover, because computer printouts are the only practical method by which the allegations of the complaint can be brought before the Court and there is generally a reduced evidentiary standard in preliminary injunction motions,[1] the Court finds that, as a general rule, Zadeh's declaration is sufficient to establish the exhibits' authenticity.[2]

---

**1.** *See, e.g., Asseo v. Pan American Grain Co., Inc.,* 805 F.2d 23, 26 (1st Cir.1986)("affidavits and other hearsay materials are often received in preliminary injunction proceedings").

**2.** Perfect 10 has attempted to further elaborate on the authentication issue in its Reply to Evidentiary Objections ("Evid.Reply") and in Norman Zadeh's Second Declaration ("Zadeh Decl. II") ¶¶ 3–7, but the Court did not consider this information. Despite the general admissibility of these exhibits, there are individual exhibits that are insufficiently authenticated, *see, e.g.,* Zadeh Decl. Ex. 17, and the Court does not rely on them in its findings of fact. Because of the sheer volume of evidentiary objections, the Court's discussion must be held at a certain level of generality. Where either party's arguments on admissibility are persuasive, the Court simply disre-

This is particularly true with regard to e-mail communications attributed to Brad Estes. Mr. Estes's deposition testimony establishes that it is part of his duties to respond to posts in Adult Check's "web-masters lounge" and that he responds to e-mails from webmasters concerning aspects of Cybernet's "Adult Check" program. Mausner Decl., Ex. C at 94–97.

## B. E–MAILS BETWEEN CYBER-NET EMPLOYEES AND THIRD PARTIES

Cybernet does not object to the Court's consideration of the communications purportedly made by Cybernet's employees "if the Court were to accept Plaintiff's scanty authentication" but does object to consideration of the communications attributed to third parties on hearsay grounds. *See* Evid. Obj. at 3. The Court treats the communications attributable to Cybernet employees as party admissions and will accept the third party communications only insofar as they indicate notice of infringing or potentially infringing activity.[3] *See* Fed.R.Evid. 801.

## C. PRINTOUTS FROM THE THIRD–PARTY WEBSITES

■ Cybernet objects to the printouts from third-party websites as a violation of the rule against hearsay. *See* Fed.R.Evid. 801. To the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all—and thus fall outside the ambit of the hearsay rule.[4] To the extent that Perfect 10 relies on directories

and the like as assertions that the links provided actually connect to the subject matter claimed in the link, the Court finds the hearsay issue to be a closer question. The Court will deal with this issue, should it arise, on a case-by-case basis. As for any asserted connection between those sites and Adult Check (Cybernet), the Court finds the evidence of Cybernet's business structure and the workings of Adult Check's age verification program combined with statements identifying the individual websites as Adult Check sites are enough to establish the sites' membership in the Adult Check program. This takes the various printouts outside the definition of hearsay, for this purpose. *See* Fed.R.Evid. 801(d)(2)(D).

## D. OBJECTION TO CHART

■ Perfect 10 has prepared a chart ("Chart 1") outlining examples of infringing conduct it claims has been or can be found on websites affiliated with "Adult Check." Zadeh Decl., Chart 1. Cybernet argues that the Zadeh declaration has failed to adequately establish how the chart was compiled, fails to lay an adequate foundation and that its descriptions of exhibits are confusing or inaccurate. Evid. Obj. at 5. The Court finds these objections, as a general matter, to be without merit.

The chart simply reiterates information found elsewhere, including the website where the information was found, the date of download, Perfect 10's claimed infringement, a brief description, which copyright

---

gards the problematic piece of evidence. The findings of fact that follow rest on evidence the Court finds admissible or proper for consideration in the context of this motion.

3. There are several exhibits attributable to employees other than Brad Estes. These are authenticated through the discovery process, but the Court also finds that they should be

appropriately considered because there is no indication that any of these employees have been deposed as of yet.

4. When used for this purpose, the Court assumes they are subject to the best evidence rule, Fed.R.Evid. 1001. The Court finds that these printouts meet the Rule, for present purposes.

registration covers the claimed Perfect 10 images, and an assertion concerning rights of publicity. To the extent this information is found on the face of each exhibit it is unobjectionable. Further, any errors in describing the contents are easily confirmed by visual inspection of the exhibits. Finally, Perfect 10 has provided information supporting its claimed copyrights and rights of publicity. The Court finds no reason to exclude Chart 1 and has found it a helpful reference in its review of the voluminous documents provided.

### E. REPLY EVIDENCE

Perfect 10 has supplied the Court with a significant volume of reply evidence. Perfect 10 claims most of this evidence is directed at arguments made by Cybernet that this motion should be barred by laches or the doctrine of "unclean hands," challenges to Perfect 10's claims of copyright ownership, and Cybernet's claims to be effectively policing the websites making use of the "Adult Check" brand. Cybernet moved *ex parte* for an order striking all this evidence, which the Court denied in a previous minute order. Nevertheless, for reasons that will become clear the Court has felt no need to consider any of this proposed rebuttal evidence, although isolated exceptions to this general rule will be noted as they appear.

### F. OBJECTIONS TO CYBERNET'S DECLARATIONS

The Court sustains Cybernet's objections to the Lane Declaration's ¶¶ 70, 71, and 81, except to the extent they may be used as party admissions.

5. Perfect 10 has not objected to Cybernet's request for judicial notice of this newspaper article.

6. For purposes of this motion, the Court finds that Zadeh's role as CEO and familiarity with

### III. FINDINGS OF FACT

Pursuant to Fed. Rule of Procedure 52(a), the Court makes the following findings of fact:

**Perfect 10**

1. Plaintiff Perfect 10, Inc. ("Perfect 10") was formed in 1996 by Norman Zadeh, who has occupied the post of Chief Executive Officer ("CEO") since Perfect 10's formation. Zadeh Decl., ¶ 2.

2. Mr. Zadeh received his Ph.D. in Operations Research in 1972, spent some time working in IBM's computer research department, and has taught applied mathematics as a visiting professor at Stanford, UCLA, U.C. Irvine, and Columbia Universities. *Id.,* ¶¶ 3,4.

3. Armed with a single idea—that there was a market for "classy" pictures of nude women without breast implants, cosmetic surgery, or the like—Perfect 10 was formed. Jenal Decl., Ex. L at 94.

4. Although Mr. Zadeh did not prepare a formal business plan before launching Perfect 10, he had some idea of the costs involved and an idea of how the magazine would develop. Id. at 93; Request for Judicial Notice, Ex. 1 (*"Bacon's* article") at 4.[5]

5. Since Perfect 10's formation, it has built its circulation up to approximately 90,000 issues.[6] Zadeh Decl., ¶ 9.

6. Perfect 10 created a website, Perfect10.com, in 1996. *Id.*

all aspects of Perfect 10's business lays an adequate foundation for information related to Perfect 10's market position, particularly as the Court finds the majority of Zadeh's testimony and declaration credible.

7. Perfect10.com receives about 100,000 visitors each month. *Id.* There is no indication how many paid subscribers Perfect10.com has attracted.

8. Perfect 10's first magazine was published in 1997. Jenal Decl., Ex. L at 97.

9. Since Perfect 10's inception it has created approximately 3,000 photographic images. Zadeh Decl., ¶ 12.

10. Perfect 10 sells memberships allowing access to Perfect10.com at a rate of $25.50 per month to persons 18 years and older. *Id.,* ¶ 13.

11. Despite Perfect 10's costs per individual picture rising into the thousands of dollars, Perfect 10 has not been profitable. See Jenal Decl., Ex. L at 97–101. The company is now losing approximately $4 to $5 million per year. *Id.* at 101.

12. Some of this loss was anticipated by the CEO, Mr. Zadeh, although in retrospect those estimates were low. *Id.* at 95; *Bacon's* Article at 4–5. In an August 1997 interview, Mr. Zadeh, said that he planned to publish the magazine six times a year at $6.95 per issue. *Bacon's* Article at 5. For the interview, he stated that he'd be happy losing $500,000 a year, but that he felt he could expect to break even with a few issues. *Id.* At the time, he felt that the magazine would begin attracting advertisers when circulation reached 150,000 to 200,000 copies. *Id.*

13. Perfect 10 lost an estimated $700,000 per issue for the two issues it published in 1997. Jenal Decl., Ex. L at 99. In 1998, Perfect 10 published four issues and estimates losses around $500,000 per issue. *Id.* at 100.

14. In addition to its website and magazine, Perfect 10 has also produced calendars and model of the year videotapes. *Id.* at 101.

**Age Verification Services**

15. The online-pornographic industry faces the constant threat of litigation and regulation stemming from a variety of fears, including access by under-age users and violations of obscenity laws, including those against child pornography, bestiality and other such subjects that the government identifies and chooses to regulate. *See, e.g.,* Lane Decl. ¶¶ 25, 44.

16. Age verification services ("AVS") are meant to provide some level of reassurance to all involved.

17. An AVS places a computer script on individual webpages or websites. Farmer Decl., ¶ 15. When a visitor hits a page containing the script, it provides a prompt before allowing the visitor to view the page or other pages on the site. *Id.* AVS services sell passwords to consumers so they can gain access to materials on participating websites. Lane Decl., ¶ 47; Farmer Decl., ¶ 13.

18. Although not a perfect screen, the credit card is a relatively strong proxy for identifying those who are 18 or older. Lane Decl., ¶ 46.

## AVS and Credit Card Billing

19. The growth of the online-pornographic business has been a boon to credit card companies. Lane Decl. ¶ 32. At the same time, credit card companies have had problems with a phenomenon called chargebacks as they relate to online adult businesses. *Id.* ¶¶ 51, 52.

20. Chargebacks are requests for reversals of credit card charges and are often tied to customer complaints. *Id.* ¶ 51. Mastercard and Visa have established strict limits on the percentages of chargebacks they will tolerate from any one account. *Id.* ¶ 52. Merchants exceeding those limits are heavily fined and may lose their merchant processing accounts. *Id.*

## Cybernet Ventures, Inc.

21. Cybernet Ventures, Inc. ("Cybernet") runs an AVS called "Adult Check." Lane Decl., ¶ 46. Cybernet, through its Adult Check brand, bills itself as the leading AVS on the Internet. *Id.* ¶ 48. Adult Check claims to have approximately 300,000 "regular" sites and 14,000 "Gold" sites using its service. Umbreit Decl., ¶ 24.

22. Based on Adult Check's image requirements, it estimates that there are over 20 million images available on participating web sites. *Id.* On an average day, Cybernet authenticates an average of 1.9 million Adult Check IDs. *Id.* ¶ 12.

## Adult Check's Internal Organization

23. Individual "webmasters" run the websites that make up the Adult Check "network." [7] *See, e.g.,* Lane Decl., ¶ 58. These webmasters are not charged to use the Adult Check service. Umbreit Decl., ¶ 7.

24. Each webmaster is responsible for running the website, including creating the site's content, finding a server to host the site and other technical details, as well as promoting the site. Lane Decl., ¶¶ 34–36.

25. When a new user visits one of these sites, they are directed to Cybernet's site on adult-check.com to register with Adult Check. Farmer Decl., ¶ 14; Umbreit Decl. ¶¶ 9, 10.

26. Cybernet has two tiers of membership available, a "regular" membership and an "Adult Check Gold" membership. *See, e.g.,* Umbreit ¶ 24. For $19.95 every three months, a regular member receives access to all sites using the AVS, except for the Gold sites. Zadeh Decl., Ex. 1 at 2. The Gold sites contain more images, more diversity, and generally meet more criteria aimed at ensuring these sites are higher-quality than those available to "regular" members. *See, e.g.,* Zadeh Decl., Ex. 1 at 19–20 (contrasting requirements); Umbreit Decl., ¶ 22. The Gold memberships are more expensive and provide access to all the websites classified as Adult Check Gold (approximately 14,000 sites) for a

---

7. "Webmasters" are the operators of the individual websites that can be accessed using an Adult Check ID.

price of $19.95 per month. Zadeh Decl., Ex. 4.

27. All fees paid by these members go directly to Cybernet. On a semi-monthly basis Cybernet then pays each individual webmaster a commission attributed to the site where the member originally signed up for his or her Adult Check membership. Umbreit Decl., ¶ 13; Zadeh Decl., Ex. 1 at 8–10.

28. There are two main factors driving an AVS service's success, the quantity of images available on the participating websites and their quality. See Lane Decl., ¶ 54; Umbreit Decl. ¶ 22. There is also a need to prevent a redundancy of similar sites because this dilutes the experience of viewers, increasing dissatisfaction with a service and increasing the likelihood of users leaving the service or requesting chargebacks. Lane Decl., ¶ 57; Zadeh Decl., Ex. 1 at 21.

29. Adult Check has a financial incentive to insure that the participating websites are numerous, somewhat distinctive and contain images that attract users. As a result Adult Check has adopted a variety of guidelines concerning the content provided by the websites using its name and services. Zadeh Decl., Ex. 1 at 15–24.

30. Adult Check has divided up its websites into six tiers. They are as follows:

Tier 1. Adult Check exclusive sites with only Adult Check ads or no ads at all;

Tier 2. Adult Check exclusive sites with both Adult Check ads and non-Adult Check ads;

Tier 3. Adult Check Exclusive sites with non-Adult Check ads.

Tier 4. Non-exclusive sites with only Adult Check ads or no· adds ad all;

Tier 5. Non-exclusive sites with both Adult Check ads and non-Adult Check ads;

Tier 6. Non-exclusive sites with non-Adult Check ads.

Each tier involves greater value for users along a spectrum defined by greater commitment to the Adult Check brand.

*See* Zadeh Decl., Ex. 1 at 16.

31. Cybernet views sites and assigns keywords to further efficiency of an internal search engine that it provides as a service to consumers. Zadeh Decl., Ex. 12 at 63.

32. Part of Cybernet's Adult Check service is a linking service found on adultcheck.com. Cybernet provides links to various webpages organized by category, including categories devoted to celebrity sites. *See, e.g.,* Zadeh Decl., Exs. 72 & 81.

33. Adult Check also provides a search function that searches for content within the Adult Check affiliated websites and webpages. Umbreit Decl., ¶ 17.

**Adult Check Policies**

34. Adult Check has also endorsed a number of "General Policies," including:

1) Any unlawful activities or activities that, within the sole and absolute discretion of Adult Check may be or are harmful to its reputation, image, goodwill (including but not limited to inappropriate Usenet

postings or spamming) will result in immediate termination;

2) Illegal content is strictly prohibited. Illegal content includes, but is not limited to: minors, rape and bestiality;

3) Fraud, illegal activities, unfair or deceptive trade practices or violation of the Adult Check Policies will result in immediate termination of your account; and

4) Violation of the Adult Check limited use license of trademarks and copyrighted materials is prohibited.

Zadeh Decl., Ex. 1 at 13.

35. Adult Check also has a policy related to its Links Page, which leads Adult Check users to various sites and webpages by providing a directory organized by category. In order to be listed on the Links Pages:

1) A site may not display, publish, link to or provide access to any images, pictures, stories, video clips or any other media portraying any content that is deemed illegal in the United States. Any site containing content deemed illegal in the United States will be removed from the Links Page and the account will be deactivated;

2) Each Adult Check Site must contain unique, quality and adequate content. The quality, uniqueness and adequacy of the content is solely within the discretion of AC, but generally means at least 30 pictures of sufficient quality to provide value to the Adult Check customer. These guidelines are loose and subjective to insure that there is a definite benefit for the Adult Check customers without requiring them to pay extra fees;

3) A participating site must be placed in the appropriate category of the Links Pages and the description of the site must be accurate. Any deceptive information is grounds for removing the site from the Links Page.

4) Site names and site descriptions must not be false, misleading or deceptive.

5) Multiple sites owned by the same person or entity must be designed as individual sites and may not be listed more than once.

6) Feeder sites must also comply with the minimal standards.

7) Membership sites requiring further membership fees must provide content before an Adult Check customer is required to pay any fees.

8) The webmaster is responsible for providing all content. Cybernet disclaims any responsibility for content.

9) All sites are reviewed and monitored for continued compliance.

10) Each site submitted must be unique. Templated sites will not be accepted for placement on the links page. Templated sites are defined as two or more sites that are created or appear to the viewer as substantially identical, despite minor variations such as site title.

11) The use of any registered trademark, trade name, copyright or exclusive publicity right without proper authority or written consent of the owner, will not be permitted on any Adult Check site. violation of this policy will, among other things, result in the removal of the violating site from the Links pages and the termination of the website's affiliation with Adult Check.

Zadeh Decl., Ex. 1 at 15, 16.

36. Adult Check also has a Child Pornography policy. Adult Check classifies its Child Pornography policy as "zero tolerance." This policy is enforced anywhere images, *words or inferences* relating to child pornography are used in conjunction with the Adult Check system. Adult Check explicitly states: "This is not limited to sites linked to from our links pages," thus implying it applies to all content accessed through the use of Adult Check passwords. When this policy is violated, the site will be closed, removed from the Adult Check system without warning, the limited use license for the Adult Check script will be revoked and the offender must remove all links and references to Adult Check from the offender's sites, presumably going beyond the single webpage or site where the offending material appears. Zadeh Decl., Ex. 1 at 14, 15 (emphasis added to quote).

37. Prior to August 8, 2001, Cybernet's policy on copyright and trademark violations was self-characterized as "neutral." In an email, one employee put it this way:

If Webmaster A contacts us and says that Webmaster B is violating his or her copyrights or trademarks we will do one thing and one thing only. Adult Check will forward an email from Webmaster A to Webmaster B. It is then Webmaster B's responsibility to reply to Webmaster A and solve the matter.

It would never be a good idea for Adult Check to take any other stance in these matters. Doing so would open a huge amount of legal liability due to the possibility of error. Webmaster A could be lying and Webmaster B could have designed the site first and it could have actually been Webmaster A who copied it! This is why we stay neutral.

Zadeh Decl., Ex. 20 at 240; *see also* Mausner Decl., Ex. C at 97.

38. Since August 8, 2001, Cybernet has promulgated a copyright policy labeled "Digital Millennium Copyright Act ('DMCA') policy". Under this policy, a notice of infringement sent to Cybernet must include:

1) A physical or electronic signature of the owner or a person authorized to act on behalf of the owner;

2) An identification of the copyrighted work and if it is located on a web page, the specific address of the web page should be provided;

3) ID of the material that is claimed to be infringing or the subject of infringing activity; and

4) a statement of good faith belief that use of the material is not authorized by the copyright owner, its agent or the law.

According to Cybernet's "DMCA Policy", upon receipt of a written notification meeting *all* of its criteria, Cybernet will:

1) act expeditiously to remove links or disable access to the allegedly infringing material;

2) take reasonable steps to promptly notify the accused subscriber; and

3) forward a copy of the written notification to the accused subscriber.

This policy then provides for a counter notification procedure to be used by webmasters accused of infringement. Finally, "in appropriate circumstances

where [Cybernet] receives multiple notices, subscribers to [its] age verification services will be terminated."
Zadeh Decl., Ex. 1 at 21–24.

39. There is no credible evidence that Cybernet actively enforces its "DMCA policy." Rather there is evidence that four months after the policy became effective and well after this action had begun, clearly infringing pictures were on websites identified by Perfect 10 in its Second Amended Complaint, *see* Zadeh Decl., Ex. 76, as well as blatantly infringing pictures on sites listed in the Third Amended Complaint, *see* Zadeh Decl., Ex. 31.

**Conduct by Adult Check Affiliated Websites**

40. Sites affiliated with Adult Check have engaged in a range of conduct, of which a representative sample includes:

41. On August 6, 2001, a website affiliated with Adult Check, named FemCelebs and located at animald.com, contained identical copies of at least three Perfect 10 magazine covers. Zadeh Decl., Ex. 8. Perfect 10 was assigned rights of publicity by the pictured models. Zadeh Decl., Ex. 117

42. On December 19, 2001, another Adult Check affiliated website, Celebrities Online, located at www.celebs-online.com, displayed identical copies of several photographs containing pictures derived from the Perfect 10 magazine and Perfect 10's website. The pictured model had assigned her rights of publicity to Perfect 10. Several of the pictures contained the words Perfect 10 as well as a Perfect 10 copyright notice. Zadeh Decl., Ex. 31.

43. On December 20, 2001, another site affiliated with Adult Check, Before & After, located at joebosco.com, displayed identical pictures derived from Perfect 10's magazine and containing models who had assigned their rights of publicity to Perfect 10. Zadeh Decl., Ex. 38.

44. On December 22, 2001, fredd38.com, part of the websites owned by defendants FTV, ftv. net, Vic Toria, and AEI Productions (collectively, "the FTV defendants"), and affiliated with Adult Check, displayed a picture purporting to be Christina Aguilera posing topless, but actually contained a photograph of a Perfect 10 model found on its website, altered by adding Ms. Aguilera's head. Zadeh Decl., Ex. 46. This model had assigned her rights of publicity to Perfect 10.

45. On December 11, 2001, the website located at celeblust.com, also owned by the FTV defendants, displayed a picture purporting to be a topless Faith Hill, but the site actually contained a digitally altered image of a Perfect 10 model. Zadeh Decl., Ex. 57

46. These examples are not isolated and Perfect 10 has found more than 10,000 copies of Perfect 10 images on approximately 900 websites affiliated with Adult Check.[8] Zadeh Decl., ¶ 46.

---

**8.** The Court finds Mr. Zadeh's testimony on this count to be credible and Cybernet has advanced no information to dispute it.

**Defaults Entered**

47. Sean Devine has had a default entered against him based on Perfect 10 images and models displayed on the website Babe-sofBablyon.com. *See* Zadeh Decl., Ex. 115.

48. Default has been entered against defendants Funet, Inc. and AEI Productions, Inc. *See* Zadeh Decl., Ex. 116 & Ex. 114.

**Extent of Problematic Images and Sites**

49. A significant number of the images found on websites affiliated with Adult Check consist of images:

1) containing celebrities who have not consented to the use of such images;

2) containing the heads of celebrities superimposed on other models, including Perfect 10 models;

3) displaying images identical to those protected by Perfect 10's copyrights;

4) displaying Perfect 10's trademarks;

5) displaying copies of Perfect 10's images with another identifying mark placed on the image; and

6) containing images of models who have assigned their rights of publicity to Perfect 10.

50. Celebrity websites make up approximately 4,000 of the 314,000 websites affiliated with Adult Check. They may make up as many as 2,000,000 of the images found on the Adult Check affiliated sites. Umbreit Decl. ¶ 19.

51. Some of these websites identify themselves as "fake." Zadeh Decl., Ex. 107.

52. Some of these websites portray graphic scenes and create the impression that the celebrities mentioned are affiliated with the action presented.

53. Cybernet chooses which websites are placed in the celebrity category.

**Notice to Cybernet of Problems on Affiliated Sites**

54. Cybernet was provided with notice of 18 celebrities that objected to usage of their identities and/or images on Adult Check affiliated sites back in November 27, 2000. Zadeh Reply Decl. ("Zadeh Decl. II"), Ex. 19 at 267.[9]

55. On January 7, 2002, Perfect 10 provided a number of declarations to the Court from celebrities, generally providing:

I have not licensed any pornographic website or any affiliate of such website to sue or exploit my name, likeness or identity. In general, I do not want any entity to use or exploit my name, likeness or identity, without my express written permission, or the permission of my manager or someone with the authority to act on my behalf.

Aguilera Decl.

56. In order for a site to be accepted into the Adult Check system, Cybernet reviews the site. Zadeh Decl., Ex. 30 at 287a.

---

**9.** The Court utilizes this evidence because it is consistent with a declaration submitted by Lin Milano to the Court in August 22, 2001. That declaration provides evidence of notice and the e-mail meets Cybernet's previous objection that Ms. Milano's declaration does not meet the best evidence rule. *See* Evid. Obj. to Decl. of Lin Milano, filed Aug. 23, 2001.

57. Among the considerations in reviewing these sites, Cybernet looks for potentially underage images and overuse of celebrity images. *Id.* at 287b

58. On February 27, 2001, three months after a group of celebrities provided Adult Check with direct notice that use of their images was not allowed, an Adult Check employee refused to accept a site, stating:

Please make sure that your site does not have any of the following models in its principal content [incl. models listed in request] .... This content cannot be allowed since *it would continue to oversaturate our links page.* Zadeh Decl., Ex. 30 at 287b (emphasis added).

59. Generally, Cybernet considers an image to be oversaturated if it appears 7 to 10 times. *Id.*, Ex. 1 at 21; Ex. 30 at 287b.

60. Cybernet has a staff of twelve that reviews sites when they initially join Adult Check, with a goal of doing monthly reviews, and the staff also does spot checking. Mausner Decl., Ex. C at 102, 114.

61. Cybernet actively reviews and directs affiliated webmasters on the appearance and content of their sites. Zadeh Decl., Ex. 30.

62. Cybernet provides Adult Check webmasters with a variety of tools to help them develop their websites. *See, e.g.,* Zadeh Decl., Exs. 1, 18.

63. Adult Check's Knowledge Base does not discuss protection of copyrights, trademarks or publicity rights. *See* Zadeh Decl., Ex. 18.

## IV. CONCLUSIONS OF LAW

1. There is not a serious question on the merits concerning Cybernet's liability for direct copyright infringement of Perfect 10's copyrights.

2. There is a strong likelihood of success for Perfect 10's contributory copyright infringement claims against Cybernet.

3. There is a strong likelihood of success for Perfect 10's vicarious copyright infringement claims against Cybernet.

4. There is a substantial question whether or not Cybernet is a provider of online services under the Digital Millennium Copyright Act ("DMCA").

5. If Cybernet qualifies as an online service provider under the DMCA there is little likelihood that any DMCA "safe harbor" will apply.

6. There is not a strong likelihood of success on Perfect 10's direct liability claims against Cybernet for violating the models' publicity rights assigned to Perfect 10.

7. There is a strong likelihood of success on Perfect 10's claims of aiding and abetting liability for Cybernet's role in the violations of the publicity rights assigned to Perfect 10.

8. Perfect 10 has standing to assert as an unfair business practice the abuse of publicity rights for those persons who have provided Cybernet with actual notice that use of their images is not authorized.

9. There is a strong likelihood of success on Perfect 10's claim that Cybernet has violated California's unfair business practices act by violating the rights of publicity for

those persons who have provided Cybernet with actual notice that use of their images is not authorized.

10. There is not a strong likelihood of success on Perfect 10's claims that Cybernet is liable for contributory trademark infringement of Perfect 10's trademark rights.

11. Cybernet has not made a good faith effort to root out illegal conduct among its webmasters and gains direct financial gains as a result.

12. Cybernet is a competitor of Perfect 10's.

13. There is a strong likelihood that Perfect 10 will prevail on its claim that Cybernet's practices are "unfair" under the unfair business practices act.

14. The unclean hands and laches doctrines are not applicable to this motion.

15. Harm is presumed for unfair competition, violations of copyright, and for trademark infringement.

16. Perfect 10 has shown a strong likelihood that it will suffer irreparable harm if the unfair business practices, copyright violations, and trademark violations are not enjoined.

17. Enjoining these practices is consistent with the public interest.

18. Enjoining these practices will not result in an inequitable burden on Cybernet.

19. The balance of hardships tips in favor of Perfect 10.

## V. PRELIMINARY INJUNCTION STANDARDS

In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. Under the first test, the Court may not issue a preliminary injunction unless: (1) the moving party has established a strong likelihood of success on the merits; (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted; (3) the balance of hardships tips in favor of the movant; and (4) granting the injunction is in the public interest. *See Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 674–75 (1984); *Greene v. Bowen,* 639 F.Supp. 554, 558 (E.D.Cal.1986). Under the alternative test, a plaintiff must show either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that a serious question exists going to the merits and that the balance of hardships tip sharply in the plaintiff's favor. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987).

■ The two tests represent a continuum of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success must be shown. *See Regents of Univ. of Calif. v. ABC, Inc.,* 747 F.2d 511, 515 (9th Cir.1984). *See also Benda v. Grand Lodge of Int'l Ass'n of Machinists,* 584 F.2d 308, 315 (9th Cir.1978).

## VI. LIKELIHOOD OF SUCCESS

### A. COPYRIGHT INFRINGEMENT

#### 1. Direct Infringement

■ To prove copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of protectable expression by the defendant. *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir.1987). Infringement occurs when a defendant violates one of the

exclusive rights of the copyright holder. 17 U.S.C. § 501(a). Direct infringement does not require intent or any particular state of mind, although willfulness is relevant to the award of statutory damages. 17 U.S.C. § 504(c).

### a. Does Perfect 10's Registered Copyright In Its Magazines Cover The Individual Pictures Involved Here?

■ Cybernet's first line of defense is to challenge the adequacy of Perfect 10's showing of copyright protection for its claimed images. Opp'n at 18. Cybernet contends that the copyright registrations produced in this motion involve collective works, the Perfect 10 magazines and the Internet site, but the registrations do not establish copyrights in the individual pictures. Opp'n at 18. Cybernet's only authority is a quote to 17 U.S.C. § 103(b) which provides:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work and distinguished from the preexisting material employed in the work and does not imply an exclusive right in the preexisting material. The copyright in such work is independent of, and does not alter or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b).

It is unclear exactly what Cybernet is challenging—Perfect 10's ability to bring suit under the Copyright Act, the scope of the registrations, the entitlement to the presumption of *prima facie* validity as to the copyright registration, or directly challenging Perfect 10's claimed copyright in these images.

■ As an initial matter, where the owner of a copyright for a collective work also owns the copyright for a constituent part of that work, registration of the collective work is sufficient to permit an infringement action under 17 U.S.C. § 411(a).[10] Moreover, the Court finds that Perfect 10 is entitled to treat the copyright registrations as *prima facie* evidence that the individual pictures are copyrighted. *See Autoskill, Inc. v. National Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487–88 (10th Cir.1993), *disagreed with on other grounds, Parker v. Bain*, 68 F.3d 1131, 1136 n. 8 (9th Cir.1995); *cf.* 17 U.S.C. § 404 (similar principle with regard to reach of copyright notice in collective work). Perfect 10's copyright registrations for the magazine issues indicate that they are collective works where contributions to the work were works "made for hire." *See, e.g.*, Mausner Decl., Ex. A at 9. The website registration recognizes that the two-dimensional text and photographs on the site include contributions made for hire and incorporate photographs published in the Perfect 10 magazine. Id. at 7–8. The Court concludes this is sufficient to raise the presumption of validity, particularly where Cybernet has made no sustained argument to the contrary.[11] Per-

---

**10.** *Morris v. Business Concepts, Inc.*, 259 F.3d 65, 68 (2d Cir.2001); *see also* 37 C.F.R. 202.3(b)(3)(2001)("the following shall be considered a single work: ... all copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication and in which the copyright claimant is the same."); *Hilliard v. Mac's Place, Inc.*, 1994 WL 323961 *1 (W.D.Wash.1994).

**11.** The Court finds the case of *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 490 (9th Cir.1985) *abrogated on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), distinguishable. There the Ninth Circuit refused to allow the plaintiff to use the presumption of validity to defeat the district court's finding that preexisting works did not bear a copyright notice. *Id.* This result was consistent with the discretion afforded a district court in considering the evidentiary

fect 10 has shown a strong likelihood that it owns a valid copyright in the identified images.

### b. Has Cybernet Violated Any of Perfect 10's Rights Under the Copyright Act?

 Cybernet's other argument fares better. Cybernet contends that it cannot be held directly liable for any copyright infringement carried out by its affiliated websites because "no infringing files exist on any computer equipment owned by Cybernet." Opp'n at 19. Perfect 10 does not address this argument in its reply papers and the Court finds that there is little likelihood of success on this claim. Assuming that websites on the Adult Check system infringe Perfect 10's copyrights, there is no evidence that Cybernet owns any of these websites or otherwise engages in directly infringing activity in the classic sense.

There might exist another route to direct liability, however. Computer technology, and in particular the Internet, has created a challenge to copyright's strict liability scheme. Because of the architecture of the web and the workings of computer technology, almost any business that utilizes computer hardware to create access to the Internet or to store content may find its hardware creating or displaying infringing material as a result of decisions by third-parties (the system's users) without the business doing any truly volitional actions.

*Religious Technology Center v. Netcom On-Line Comm. Servs., Inc.,* 907 F.Supp. 1361 (N.D.Cal.1995), illustrates this point vividly. In *Religious Technology,* a disgruntled former Church of Scientology member was accused of posting copyrighted works on the Internet. *Id.* at 1365–66. This member used a bulletin board service (BBS) to gain access to the Internet, and the BBS in turn used the facilities of Netcom to provide this access. *Id.* at 1366. When the initial defendant sent his postings to the Internet, the information was automatically stored briefly on the BBS's computer and then automatically copied on Netcom's computer. *Id.* at 1367. Once on Netcom's computers, the messages were then available to Netcom's users and eventually to all users that participated in a service called Usenet. *Id.* at 1367–68.

The Ninth Circuit in a previous case, *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 518 (9th Cir.1993) had upheld a finding of copyright infringement where a repair person who was not authorized to use a computer owner's licensed operating system software had merely turned on the computer.[12] The relevant copying in *MAI Systems* was the loading of the operating system into the computer's memory long enough to check an "error log." 991 F.2d at 518. Similarly, in *Religious Technology,* the existence of the messages on the system were "sufficiently 'fixed' to constitute recognizable copies under the Copyright Act." 907 F.Supp. at 1368.

weight to be accorded a certificate of registration, *see* 17 U.S.C. § 410(c). Additionally, evidence was brought in contradicting the presumption of validity and it was conceded the copyright covered a derivative work. 777 F.2d at 489–90. Cybernet has not made an argument to establish similar points, nor addressed the Court's discretion under § 410(c). In this case, the Court will therefore favor the presumption of validity over Cybernet's at-

tempt to reverse this presumption for collective works by assuming that they are merely derivative works. Although Perfect 10 refers to the registered works as a "compilation" in its Reply, *see* Reply at 15, the Court notes that the certificates claim to cover "collective works."

12. *But see* 17 U.S.C. § 117 (limiting reach of exclusive rights in precisely this situation).

Nevertheless, the *Religious Technology* court found Netcom was not liable for direct copyright infringement. *Id.* at 1372–73. First the court noted that Netcom had not initiated the copying. *Id.* at 1368. The court then analogized Netcom's creation of a system that automatically and uniformly creates temporary copies of all data through it to a copying machine. *Id.* at 1369. The court rejected the possibility that such actions could violate the exclusive right to reproduce a work absent some further element of volition or causation, relying on the unreasonable liability such a regime would create. *Id.*

Similarly, the *Netcom* court rejected the argument that the storage of the works on Netcom's system for up to eleven days violated the plaintiffs' right to publicly distribute and display their works. *Id.* at 1371–72. The court found that there were the same causation and volition problems that infected the reproduction claim. *Id.* at 1372. The actions of the BBS provider were automatic and indiscriminate. *Id.* Moreover, the court pointed to the fact that Netcom did not maintain an archive of files for its users, thus it could not be said to be supplying a product to users. *Id.* This contrasted with some of its competitors that created or controlled content available to their subscribers. *Id.* The failure to establish any violation of the plaintiffs' reproduction, distribution or display rights *by Netcom* thus defeated plaintiffs' direct infringement theory. *See id.* at 1370, 1373.

Following the *Religious Technology* decision, another district court found a BBS operator that knew about copyright infringement on its service and encouraged others to upload infringing products onto its service could not be held liable on a direct infringement theory. *See Sega Enterprises, Ltd. v. MAPHIA,* 948 F.Supp. 923, 931 (N.D.Cal.1996). This was so because the activity charged had no bearing on whether the BBS operator "directly caused" the copying to occur. *Id.*

Finally, in *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,* 982 F.Supp. 503, 512 (N.D.Ohio 1997), a district court found direct infringement despite its agreement with the rationale of *Religious Technology.* The *Hardenburgh* court stressed that a direct infringer must "actually engage" in one of the activities reserved to copyright owners. *Id.* In *Hardenburgh,* the court found that the defendant BBS providers engaged in two of the activities exclusively reserved for copyright owners. *Id.* at 513.

First, the court found the defendants had distributed and displayed copies of Playboy photographs. *Id.* This finding hinged on the defendant's policy of encouraging subscribers to upload files onto its system, viewing the files in the upload file, and *then* moving the uploaded files into files generally available to subscribers. *Id.* This transformed the defendants from passive providers of a space to active participants in the process of copyright infringement. The moving of the files, accomplished by employees constituted the distribution, and the display of those copies after the BBS's employees *placed* the files there violated the right of display. *Id.*

The principle distilled from these cases is a requirement that defendants must *actively* engage in one of the activities recognized in the Copyright Act.[13] Based on the evidence before the Court it appears that Cybernet does not use its hardware to either store the infringing images or move them from one location to another for display. This technical separation between its facilities and those of its webmasters

---

**13.** *See also Kelly v. Arriba Soft Corp.,* 280 F.3d 934, 946 (9th Cir.2002)(holding company that designed search engine, which trolled web, found images and then inline linked and framed those images on its sites, was liable for direct infringement).

prevents Cybernet from engaging in reproduction or distribution, and makes it doubtful that Cybernet publicly displays the works. Further, there is currently no evidence that Cybernet has prepared works based upon Perfect 10's copyrighted material. The Court therefore concludes that there is little likelihood that Perfect 10 will succeed on its direct infringement theory.

### 2. Contributory Infringement

 Liability for contributory copyright infringement attaches when "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir.2001)("*Napster II* "). Put differently, liability exists if the defendant engages in personal conduct that encourages or assists the infringement. *Id.* The standard for the knowledge requirement is objective, and is satisfied where the defendant knows or has reason to know of the infringing activity. *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971).

#### a. Cybernet's Knowledge

 Cybernet's only argument against Perfect 10's contributory infringement theory is that Cybernet lacks the requisite knowledge to be held liable. Opp'n at 20. Cybernet relies heavily on Perfect 10's failure to contact Cybernet with its claims

before beginning the present litigation. *Id.* According to Cybernet, although it employs twelve site reviewers, even if they had seen Perfect 10 copyright notices on various sites, they would not necessarily know Perfect 10's copyrights were infringed because they might be licensed. *Id.* at 20–21.

In contrast, there is evidence that Steven Easton of the Association for the Protection of Internet Copyright contacted Cybernet with approximately 2,000 e-mails, beginning in 1996 or 1997, notifying Cybernet of alleged copyright infringement on its system.[14] Easton Decl. ¶ 2. Perfect 10 has also brought forward evidence that Cybernet was notified of generic potential copyright infringement by users in 2001. Zadeh Decl., Ex. 102. Additionally, Cybernet's site reviewers review every site before allowing the sites to utilize the Adult Check system, and attempt to review other sites monthly. Mausner Decl., Ex. C at 102, 114; Zadeh Decl., Ex. 30. Although they might not detect every copyright violation, there is evidence that many sites contain disclaimers to the effect, "we do not hold copyrights for these works." Farmer Depo. at 121:19–21. Finally, Perfect 10's Second Amended Complaint, filed on June 15, 2001, contained notice of Perfect 10's allegations concerning potential infringement on 77 different websites.

This evidence of notice compares favorably with the allegations of notice in *Fono-*

---

**14.** This declaration is being used for a limited purpose, as evidence of notice. The Court finds the declaration credible and interprets Mr. Easton's claim that he began notifying Cybernet of "violations of copyright under the DMCA" in 1996 or 1997, to be a claim that he began notifying Cybernet of alleged copyright violations at that time. The Court pauses to reflect on Cybernet's earlier objection to this declaration because [it] "is simply making prejudicial and defamatory allegations against Cybernet, which can no longer be permitted,

let alone as evidence for this Court to consider," Evid. Obj. to Portions of Decls., filed December 17, 2001, in light of Cybernet's current evidence that "many of the notices sent by Steven Easton were deficient and thus, Cybernet *could* not act on them." Umbreit Decl. ¶ 26 (emphasis added). This is just another instance where Cybernet's prior invective undercuts its claims to be honestly working to address potential problems with its affiliated sites.

visa, Inc. v. Cherry Auction, Inc., 76 F.3d 259 (9th Cir.1996). In *Fonovisa*, the Fresno County Sheriff's Department seized 38,000 counterfeit tapes (copyright holders unstated) from a swap meet approximately a year and a half before the plaintiff filed suit. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 847 F.Supp. 1492, 1494 (E.D.Cal.1994) *rev'd* 76 F.3d 259 (9th Cir.1996)("*Fonovisa I*"). Additionally, the swap meet had received a letter six months before the suit from a police officer who "observed that several casual vendors of Latin audio music tapes had abandoned their booths upon his arrival." *Id.* at 1494. Finally, three months before the suit an investigator for the plaintiff witnessed infringing sales of counterfeit goods. *Id.* After the First Amended Complaint was served, investigators then revisited the swap meet where they found many vendors selling "counterfeits at tellingly low prices." *Id.* at 1495. On appeal from the district court's dismissal of the claim, the Ninth Circuit stated "There is no question that plaintiff adequately alleged the element of knowledge in this case." *Fonovisa*, 76 F.3d at 264.

Perfect 10 has raised at least a serious question on the issue of knowledge. The Court finds that there is a strong likelihood of success in proving general knowledge of copyright infringement prior to Perfect 10's filing of the complaint. There are also serious questions as to Cybernet's constructive knowledge of infringement of Perfect 10's copyrights *prior* to the complaint raised by this general knowledge, Cybernet's review of sites containing Perfect 10 images and the likelihood of those sites containing copyright disclaimers. Further, there appears to be little question

that Cybernet has been provided with actual notice of a large number of alleged infringements since June 2001.[15] The Court thus finds there is a strong likelihood of success that Perfect 10 will satisfy the knowledge requirement for contributory liability.

### b. Cybernet's Material Contribution to Infringing Activity

The Court also finds that there is a strong likelihood that Perfect 10 will succeed in establishing Cybernet's material contributions to the infringing activity. Cybernet markets the Adult Check brand through advertising, it pays webmasters commissions directly based upon the number of Adult Check users that register through the site, it provides technical and content advice, it reviews sites, and it attempts to control the quality of the "product" it presents to consumers as a unified brand. Cybernet's entire business model is premised on harnessing the competitive pressures between individual webmasters into a cooperative system that benefits the webmasters by increasing the overall value to consumers. Cybernet's role in this system is crucial, and it profits accordingly, only paying out approximately 1/2 of each subscriber's payments to the participating websites for each of its users, who access the system close to 2 million times daily.

In *Fonovisa* the Ninth Circuit had "little difficulty" in holding the allegations directed at a swap meet, where the vendors were selling counterfeit goods, sufficient to show material contribution. 76 F.3d at 263. As the court observed, "it would be difficult for the infringing activity to take place in the massive quantities alleged

---

**15.** Neither party addressed the role of post-filing conduct, but the Court notes that in *Fonovisa I*, 847 F.Supp. at 1495, and *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 918 (N.D.Cal.2000) aff'd in part, rev'd in part, 239 F.3d 1004 (9th Cir.2001)("*Napster I*"), the courts relied to some extent upon allegations in the complaint and post-filing conduct.

without the support services provided by the swap meet," including the provision of space, utilities, parking, advertising, plumbing and customers. *Id.* Similarly, Cybernet's hand in Adult Check, and in particular its steady payments to infringing sites along with its advertising, materially contribute to the growth and proliferation of any infringement. This conclusion comports with both *Napster* decisions and with *Religious Technology.*[16] The Court finds the evidence before it supports the conclusion that Perfect 10 has a strong likelihood of establishing material contribution by Cybernet to activity that infringes Perfect 10's copyrights.

### c. Contributory Infringement—Conclusion

The Court therefore finds that there is at least a serious question on the merits of Perfect 10's contributory infringement claim against Cybernet prior to the filing of the present suit and a strong likelihood of success on its claims stemming from Cybernet's post-filing conduct.

### 3. Vicarious Copyright Infringement

Courts have extended vicarious liability in the copyright context to defendants that have (1) the right and ability to exercise control over a directly infringing party and its activities and (2) obtained a direct financial benefit from the infringing activities. *Fonovisa,* 76 F.3d at 262.

### a. Direct Financial Interest

■ Cybernet argues that it does not have a sufficiently direct financial interest to be held liable for vicarious copyright infringement. Opp'n at 22–23. The Court strongly disagrees. Cybernet markets the

Adult Check brand based on both the number of images and their quality. Zadeh Decl., Ex. 4; Lane Decl. ¶¶ 54, 57. Perfect 10 has brought forward evidence that it has sunk significant resources into developing high-quality adult images. Taking Perfect 10's allegations of 10,000 infringing images at face value, as Cybernet does for purposes of this test, *see* Opp'n at 22, Cybernet benefits from the draw posed by the existence of these works provided at a cost far below that provided by the copyright owner. *See Fonovisa,* 76 F.3d at 263–64; Lane Decl. ¶ 81; *see also Napster II,* 239 F.3d at 1023 ("Ample evidence supports the district court's finding that Napster's future revenue is directly dependent upon 'increases in user base.' More users register with the Napster system as the quality and quantity of available music increases.") Cybernet benefits directly from these infringing sites to the extent that they have brought in new users because the new customers pay Cybernet directly. In addition, there is the ancillary benefit brought in by the incremental additional value these sites pose to consumers, who gain access to all sites by paying the Adult Check membership fee. *Cf. Religious Technology,* 907 F.Supp. at 1377 (granting defendant summary judgment where no evidence "that Netcom's policy directly financially benefits Netcom, such as by attracting new subscribers.") Moreover, the Court finds that there is a strong likelihood that Perfect 10 will establish a "symbiotic interest" between Cybernet and the infringing websites based on the close interrelationship between Cybernet and its affiliated websites, a relationship that appears to outside consumers as if Adult

---

**16.** *See Napster II,* 239 F.3d at 1022 (agreeing Napster provides "the site and facilities" for direct infringement because without its services users could not find what they wanted with the "ease of which defendant boasts"); *Napster I,* 114 F.Supp.2d at 919–20; *Religious Technology,* 907 F.Supp. at 1375 (denying defendant's motion for summary judgment on this issue).

Check constitutes a single brand. *See Adobe Systems, Inc. v. Canus Productions, Inc.*, 173 F.Supp.2d 1044, 1051 (C.D.Cal.2001)(discussing "symbiotic interest"). It should be noted that *all* the money associated with these websites flows directly to Cybernet before some of it is returned to the individual site owners as "commissions." The Court concludes that this evidence creates a strong likelihood Perfect 10 will establish this direct financial interest.

Cybernet relies on *Adobe Systems*, 173 F.Supp.2d at 1052, to argue otherwise. *Adobe Systems* involves a copyright action against the proprietor of weekly computer fairs where approximately one hundred pirated copies of Adobe Systems software were located at shows that averaged up to 15,000 attendees per weekend. *Id.* at 1047. On *plaintiff's* motion for summary judgment the court discussed *Fonovisa* and its requirement of direct financial benefit. *Id.* at 1050–53.

The *Adobe Systems* court read into *Fonovisa*'s discussion of vicarious liability a requirement to show "a direct financial benefit to the defendant from the 'draw' of the infringing products." *Id.* at 1050. At different points in the opinion this idea was expressed in language such as:

- "the sale of the counterfeit products must in fact be *the* 'draw' for customers to the venue." *Id.* at 1050 (emphasis added).

- "Plaintiffs must show that the vendor's infringement constitutes a draw to the venue to the extent that the economic interests of the direct infringer and those of the landlord become closely intertwined." *Id.* at 1051.

- "[P]laintiff bears the burden of demonstrating a direct financial benefit to the landlord from 'customers seeking to purchase infringing recordings' and profits which 'flow directly from cus-

tomers who want to buy the counterfeit recordings.'" *Id.* at 1050.

- "Without the requirement that the counterfeit goods provide *the main* customer draw, *Fonovisa* would 'provide essentially for the limitless expansion of vicarious liability into spheres wholly unintended by the court.'" *Id.* at 1051 (emphasis added).

- "*Fonovisa* found a symbiotic relationship existed between the infringing vendors and the landlord because 'the very success of the landlord's venture depends on the counterfeiting activity (and thus the landlord has every incentive to allow the activity to continue).'" *Id.* at 1051.

The *Adobe Systems* court then concluded that on the facts of the case, where both the number of infringements and the apparent impact of these infringements was small, there was not a symbiotic relationship and that there were triable issues of fact remaining as to whether the infringing products constituted a draw. *Id.* at 1052.

Similarly in *Religious Technology*, the court found no evidence of direct financial benefit for Netcom where it received a fixed fee. 907 F.Supp. at 1376–77. The court also found that there was no evidence that infringement by Netcom users enhanced the value of Netcom's services to subscribers or attracted new subscribers. *Id.* at 1377.

This case is unlike *Religious Technology* because Cybernet receives more than a fixed fee. The income derived from each website is directly based on the site's initial popularity. The more consumers appreciate the content of a page, the more money Cybernet receives. Cybernet's income stream pays no regard to a site's respect for copyright or lack thereof. Additionally, Cybernet (and Adult Check) depends on content to attract consumers. Cybernet has given no reason to believe

that these pages do not attract consumers, thereby creating a financial benefit to Cybernet.[17]

In comparison to *Adobe Systems*, however, the present facts pose a closer question. Cybernet attempts to hide behind the sheer volume of images on its sites to argue that even 10,000 infringing images does not establish a sufficiently direct financial interest or relationship. Opp'n at 22. The Court disagrees. In *Adobe Systems*, the court implied that the small number of infringing articles was insufficient to support a conclusion that these items provided "a significant draw" bringing consumers to the fairs. 173 F.Supp.2d at 1053. In contrast, the Court concludes that there is a strong likelihood Perfect 10 will establish a large number of infringing sites. *Cf. Playboy v. Webbworld*, 968 F.Supp. 1171, 1177 (finding sufficient financial interest where defendants received a percentage of fixed fee and there were sixty-seven infringing images on site). The Court also concludes that the fortunes of these sites and Cybernet are sufficiently tied to create the requisite direct financial benefit. *See Napster II*, 239 F.3d at 1023. The Court therefore concludes that Perfect 10 has shown a strong likelihood of success as to the direct financial interest element of vicarious liability.

#### b. Right or Ability to Control

Cybernet argues that it lacks the right and ability to control the websites because it cannot "affirmatively work as some sort of Internet 'hall monitor,' policing an unruly class of webmasters and responding instantaneously when any copyright infringement occurs." Opp'n at 23. In making this argument, it invokes the protection of the Digital Millennium Copyright Act's "notice and take-down" provision, which will be dealt with below rather than addressed in this section. Its argument attempts to distinguish the Adult Check system from Napster's system because the images used in the Adult Check system do not pass through Cybernet's hardware. Opp'n at 25. Further, Cybernet argues that it is constrained in its right and ability to control by requirements of actual notice. *Id.*

The notice argument is not relevant as it does not address Cybernet's control *abilities*. Rather it addresses when those abilities should be exercised. Focusing on the ability to control the sites found in its system, the Court concludes that Perfect 10 has established a strong likelihood of success. As mentioned earlier, Cybernet has a monitoring program in place. Under this program, participating sites receive detailed instructions regard issues of layout, appearance, and content. Cybernet has refused to allow sites to use its system until they comply with its dictates. Most importantly, it monitors images to make sure that celebrity images do not oversaturate the content found within the sites that make up Adult Check. Zadeh Decl., Ex. 30. It forbids certain types of images. This ability to control other types of images belies any attempt to argue that Cybernet does not exercise sufficient control over its webmasters to monitor and influence their conduct or to deny copyright offenders the benefits of its service. *See Religious Technology*, 907 F.Supp. at 1375 (right and ability to control where "police" powers exercised in past); *see also Napster I*, 114 F.Supp.2d at 920–21 (online service's improved methods of blocking users "tantamount to an admission that defendant can, and sometimes does, police its service").

---

**17.** Additionally, the participating websites actually pay no fees to Cybernet. Instead they are paid *by* Cybernet.

Cybernet, like the swap meet in *Fonovisa*, not only has the right to terminate webmasters at will, it controls consumer access, and promotes its services. *See Fonovisa*, 76 F.3d at 262; *Napster I*, 114 F.Supp.2d at 920. Combined with its detailed policing of sites, these activities are sufficient to establish a strong likelihood of success for Perfect 10's argument that Cybernet has the right and ability to control the participating websites.

### c. Vicarious Liability—Conclusion

Because Perfect 10 has shown a strong likelihood of establishing a direct financial benefit and the right and ability to control websites that engage in infringing activity, the Court finds there is a strong likelihood of success on Perfect 10's claims for vicarious copyright infringement liability.

### 4. DMCA

In 1998 Congress passed Title II of the Digital Millennium Copyright Act ("DMCA"), Pub. L.. 105–304, Title II, § 202(a), 112 Stat. 2877 (1998)(codified at 17 U.S.C. § 512). The DMCA marked Congress' entry into the online copyright fray. The DMCA created a series of four "safe harbors" to protect "providers of on-line services" from liability, primarily monetary liability, based on claims of copyright infringement attributable to the actions of users. *See* 17 U.S.C. §§ 512(a)-(d),(j). In order to qualify for these safe harbors, a provider of online services must:

1) adopt a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers;

2) reasonably implement the policy; and

3) inform subscribers and account holders of the service provider's system or network about the policy.

*See* 17 U.S.C. § 512(i). The service provider and its policy must also not interfere with "standard technical measures" used by copyright owners to protect copyrighted works.[18] *See* 17 U.S.C. § 512(i)(1)(B).

 These "safe harbors" do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability. *See* H.R. Rep. 105–551(II), at 50 (July 22, 1998); S. Rep. 105–190, at 19 (May 11, 1998). Rather they limit the relief available against service providers that fall within these safe harbors. *See* 17 U.S.C. §§ 512(a),(b)(1),(c)(1),(d), & (j).

Of these "safe harbors," Cybernet only invokes the harbors provided by section 512(c), governing information residing on the systems or networks at the direction of users, and section 512(d), governing information location tools ("web browsers"). Moreover, these "safe harbors" could not apply prior to August 8, 2001, the date Cybernet adopted the policy it claims is aimed at compliance with the DMCA. *See*

---

**18.** The definition of standard technical measures includes a requirement that they be "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process." 17 U.S.C. § 512(i)(2)(A). There is no indication that the "strong urging" of both the House and Senate committees reporting on this bill has led to "all of the affected parties expeditiously [commencing] voluntary, inter-industry discussions to agree upon and implement the best technological solutions available to achieve these goals." H.R. Rep. 105–551(II), at 61; S. Rep. at 52. It thus appears to be an open question if *any* conduct or policy could interfere with "standard technical measures." *See* 3 *Nimmer on Copyright* § 12B.02[B][3], at 12B–29 ("Given the incentives of the various parties whose consensus is required before any such technical measures can win adoption, it seems unlikely ... that the need for any such monitoring will eventuate.")

*Costar Group, Inc. v. Loopnet, Inc.,* 164 F.Supp.2d 688, 698 n. 4 (D.Md.2001).

### a. Is Cybernet A "Service Provider"?

Cybernet devotes a single sentence to arguing that it is a "service provider" as the term is defined in section 512(k)(1)(B). Opp'n at 25. This section defines a service provider as a "provider of online services or network access, or the operator of facilities therefor," and includes entities "offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k). Section 512(k)(1)(B)'s definition has been interpreted broadly. *See ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619, 623 (4th Cir.2001); *Hendrickson v. Ebay,* 165 F.Supp.2d 1082, 1087 ("eBay clearly meets the DMCA's broad definition of online 'service provider'"). Although there appears to be uniform agreement that the definition is broad, or at least broader than the definition of 512(k)(1)(A) concerning conduit-type services, the Court has found no discussion of this definition's limits.

 Perfect 10 argues that section 512(c) was drafted with the limited purpose of protecting Internet infrastructure services in mind. Reply at 18. It contends that the definition for a provider of online services or network access does not include services that "participate in the selection or screening of that data or take an interest in the content of that data." *Id.* at 18 n. 19. The inclusion of section

512(d) which creates a "safe harbor" for copyright infringement resulting from the use of information location tools by service providers, which include directories, indexes, references, pointers and hypertext links, strongly suggests that the definition of service provider is meant to include services that only provide location service tools, as well as services providing internet access *and* such tools. *See* H.R. Rep. 105–551(II), at 58 (identifying Yahoo! as an example); *cf. also* 47 U.S.C. § 231(b)(3)(reach of Child Online Protection Act defined by similar categories). The Court adopts that reading and will not use Perfect 10's proposed interpretation to evaluate Cybernet's ability to invoke the protection of section 512's safe harbors.

Nevertheless, Cybernet has made this a more complicated issue than it probably should be by its insistence that it does not host any infringing images and no image files pass through any of its computers. Opp'n at 21. This appears to be part of an overall strategy to deny that Cybernet is anything more than an age verification service, somehow beyond the reach of copyright law, with no responsibility for the actions taken on the sites of the individual webmasters. It may be a close question whether such a service qualifies as a "service provider." [19] For the moment, however, the Court will assume that Cybernet is a "service provider" as defined in section 512(k).

### b. Does Cybernet Meet the Minimal Qualifications of Section 512(i)?

 The initial hurdle Cybernet must meet in order to qualify for section 512(k)'s

---

**19.** Because Cybernet does run a web-page, adultcheck.com and maintains computers to govern access to the Adult Check family's websites there is good reason to believe that it is an "provider of online services" under 512(k)(1)(B). *Cf.* 47 U.S.C. 231(e)(mentioning broad range of online services that an "Internet access service" could also provide);

*ALS Scan,* 239 F.3d at 623; *Hendrickson,* 165 F.Supp.2d at 1087. At the same time the fact that no images pass through Cybernet's hardware makes Cybernet a poor fit for the categories established by the DMCA, *see* 17 U.S.C. §§ 512(a)-(d), and Cybernet's service appears to fall outside the parallel definitions of 47 U.S.C. § 231(b).

restrictions on injunctive relief is found in section 512(i). These provisions require an online service provider to develop, promulgate and reasonably implement a policy providing for termination in appropriate circumstances of repeat copyright infringers. 17 U.S.C. § 512(i). In crafting these policies, Congress has given a vague indication of what constitutes "appropriate" circumstances.

In the House and Senate Reports considering this subsection, both used identical language. *See Ellison v. Robertson,* 189 F.Supp.2d 1051, 1053–54, 1064–65 (C.D.Cal.2002). The Committees each "recognize[d] that there are different degrees of on-line copyright infringement, from the inadvertent and noncommercial, to the willful and commercial." H.R. Rep. 105–551(II), at 61; S. Rep. 105–190, at 62. The Committees also stated that the provision was not intended to undermine principles governing knowledge of infringement and protection of privacy rights "by suggesting that a provider *must* investigate *possible* infringements, *monitor* its service, or make *difficult* judgments as to whether conduct is or is not infringing." H.R. Rep. 105–551(II), at 61 (emphasis added); S. Rep. 105–190, at 62 (same). The Committees than appeared to immediately qualify these statements by stating: "However, those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a *realistic* threat of losing that access." H.R. Rep. 105–551(II), at 61 (emphasis added); S. Rep. 105–190, at 62 (emphasis added).

Although the last sentence appears directed at the instigators of infringement, each Committee also noted that the DMCA preserves "strong incentives" for "qualifying" service providers to cooperate with copyright holders. H.R. Rep. 105–551(II), at 49; S. Rep. 105–190, at 20. The Court shares the concerns expressed by Nimmer and a sister court in this district in recognizing the language of the statute and the legislative history of this section are less than models of clarity. *See Ellison,* at 1066 n. 15 (treating section 512(i) as a mere threat based on language and legislative history); 3 *Nimmer on Copyright* § 12B.02[B][2], at 12B–25 & 12B–26 (identifying questions left open by statute). Nevertheless, the Court reads section 512(i) to imply some substantive responsibilities for service providers, particularly if the statute is to be read with the apparently broad reach advocated by the other courts that have considered this section.

The legislative history does provide some guidelines as to what a section 512(i) policy might look like. The service provider might not need to provide for active investigation of possible infringement.[20] No court in construing these requirements should make the knowledge standards more demanding than those found in section 512(c). *See* H.R. Rep. 105–551(II), at 61. The service provider might not need to take action for isolated infringing acts by single users. *See* 17 U.S.C. § 512(i) (referring to repeat infringers). The service provider need not act or address difficult infringement issues. *See* H.R. Rep. 105–551(II), at 61. It may not require the

---

**20.** See H.R. Rep. 105–551(II), at 61. The statement above is qualified by the "standard technical measures" language in section 512(i), which *may* require such action. See H.R. Rep. 105–551(II), at 53 ("a service provider need not monitor its service or affirmatively seek facts indicating infringing activity (except to the extent consistent with a stan- dard technical measure complying with new subsection [i] )"). A failure to impose an affirmative duty on service providers to hunt out infringers does not mean, however, that *copyright holders* cannot investigate potentially infringing activities and notify providers under a "reasonably implemented" section 512(i) policy.

service provider to actively monitor for copyright infringement. *See id.*

When confronted with "appropriate circumstances," however, such service providers should reasonably implement termination. *See* 17 U.S.C. § 512(i). These circumstances would appear to cover, at a minimum, instances where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users, particularly infringement of a willful and commercial nature. *See* H.R. Rep. 105–551(II), at 61. An evaluation of any such policy would be informed by an awareness of the service provider's function, existing technology, and the expressed Congressional desire not to undermine the privacy and knowledge requirements of the statute, while leaving the law in its "evolving state." *See* S. Rep. 105–190, at 18.

This interpretation tracks that of the *Costar* court, which found that there were material issues of fact whether a provider of real estate services on the web implemented a "reasonable" termination policy, as well as whether it acted expeditiously in taking down access to infringing material under section 512(c). *See* 164 F.Supp.2d at 704. Under this reading, section 512(i) is focused on infringing users, whereas 512(c) is focused primarily on the infringing material itself. This line of reasoning becomes particularly forceful when one considers the limitations on injunctive relief found in section 512(*l*).[21]

Making the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach copyright infringement on an image by image basis without ever targeting the source of these images. *See* 17 U.S.C. § 512(c)(1)(C)(only requiring service providers to remove or disable access to the infringing material). It would encourage a risk-taking approach, whereby service providers could allow repeat infringers to flood the web with infringing images knowing the service providers' ignorance of new infringements and the limited relief under 512(*l*) would prevent anything more than token action and no financial exposure, while the service provider continues to profit on a "non-discriminatory" basis. The incentives for such action were eloquently phrased by Cybernet in support of its arguments why they should not be held accountable for copyright infringement under the Adult Check brand: "a webmaster will quickly switch from one [AVS] to another if he or she feels the AVS is attempting to exert too much control over the content of the participating sites." Lane Decl. ¶ 62.

The Court does not read section 512 to endorse business practices that would encourage content providers to turn a blind eye to the *source* of massive copyright infringement while continuing to knowingly profit, indirectly or not, from every single one of these same sources until a court orders the provider to terminate each individual account.[22] *Cf. Costar*, 164

**21.** Section 512(*l*) provides that a service provider under subsection (a) may only be restrained from providing access to an infringer by terminating the account or from providing access to a specific, identified online location outside the United States. *See* 17 U.S.C. 512(*l*)(B). There is no ability to order such a provider to take down material, presumably because such material is no longer on the system. *See* 17 U.S.C. 512(a)(4)(limiting time copy may reside on system to that "reasonably necessary for the transmission, routing, or provision of connections"). In contrast,

service providers, as the term is defined for the other three safe harbor provisions may be restrained from providing access to the material, providing system access to the infringer, or such other injunctive relief as may be considered necessary to restrain infringement at a particular location, if it is the least burdensome form of relief available to the service provider. *See* 17 U.S.C. § 512(*l*)(A).

**22.** In response to the unstated premise of Cybernet's arguments that enforcement of the Copyright Act would hurt its business, but not

F.Supp.2d at 705 (restricting application of section 512's "financial benefit" test). The Court does recognize that section 512(*l*) allows for court orders terminating user accounts, but it also recognizes that online service providers are meant to have *strong* incentives to work with copyright holders. The possible loss of the safe harbor provides that incentive and furthers a regulatory scheme in which courts are meant to play a secondary role to self-regulation. *See, e.g.,* 17 U.S.C. § 512(i)(2)(A). The Court thus views 512(i) as creating room for enforcement policies less stringent or formal than the "notice and take-down" provisions of section 512(c), but still subject to 512(i)'s "reasonably implemented" requirement. It therefore respectfully parts ways with the interpretation of 512(i) in *Ellison,* in order to maintain the "strong incentives" for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers, at the very least.[23]

The allegations against Cybernet and the evidence before the Court is consistent with just such a jaded view of Cybernet's activities. Even in opposition, right after pointing out that "some number of webmasters have switched to other AVS vendors and some have even encouraged Cybernet's customers to cancel their subscriptions," Cybernet disclaims any intent to impose "impossible affirmative duties upon itself." Opp'n at 24. In the context of this litigation, the Court sees this as an implicit argument that rooting out repeat infringers imposes such "impossible" duties and finds it runs against Cybernet's argument that it is actually trying to cope with repeat infringers.

In opposition to the present motion, Cybernet does assert that it has taken action against individual webmasters as well as against infringing sites. Umbreit Decl. ¶¶.26–31. Cybernet has not, however, submitted any documentary evidence to support these assertions. Perfect 10's moving papers included examples of infringing conduct on sites that have been identified since the beginning of this litigation. Significantly, in its Opposition Cybernet maintains it does "what it has the power to do—namely, remove from the Cybernet search engine and links page any website about which it has received a notice of infringement," without addressing its power to stop providing its AVS service to known infringers. Opp'n at 12. The Court finds this lone declaration, unsupported by any documentary evidence, contradicted by evidence in the record, and flying in the face of Cybernet's consistent resistance to the proposition that it could, would or should exercise any control over its webmasters, simply not credible. The record supports the conclusion that Cybernet has taken great pains to avoid shouldering the burdens of the copyright regime, all the while profiting from pirates.[24]

---

address the ultimate source of the infringement, the Court finds itself sympathetic to the observation in *Playboy v. Webbworld:* "If a business cannot be operated within the bounds of the Copyright Act, then perhaps the question of its legitimate existence needs to be addressed." 968 F.Supp. at 1175. *see also Napster II,* 239 F.3d at 1026 ("Although even a narrow injunction may so fully eviscerate Napster, Inc. as to destroy its user base ... the business interests of an infringer do not trump a rights holder's entitlement to copyright protection.")

**23.** This case appears to offer an example of such behavior. In Perfect 10's Third Amended Complaint, it identified a site, www.celebpics.com, as one of the problematic Adult Check sites. In its preliminary injunction papers, Perfect 10 now complains about the website www.newcelebpics.com. *See* Zadeh Decl., Ex. 79. Although issues of ownership are unclear at this point, the inference of repeat activity is difficult to avoid.

**24.** This conclusion, formed on the basis of Perfect 10's initial evidence and Cybernet's opposition, obviated any need to consider Perfect 10's reply exhibits.

Because the Court finds that there is a strong likelihood that Cybernet cannot establish that it has "reasonably implemented" a policy directed at *terminating* repeat infringers, even in "appropriate circumstances," there is little likelihood that it can avail itself of section 512's safe harbors.

### c. Could Cybernet qualify for the safe harbors if it is a "service provider" and has "reasonably implemented" a repeat infringer policy?

 Even assuming Cybernet could somehow bring itself over the section 512(k) and (i) hurdles to have its conduct evaluated under sections 512(c) and (d), the Court finds that there is a strong likelihood Perfect 10 will prevail on its copyright claims. First the Court notes that Cybernet's assertion that these sections could "exempt" Cybernet from liability is without merit. Section 512 does not affect the elements of copyright liability. Instead, it affects the remedies available for any infringement which might be found. The Court will nevertheless address why it believes Cybernet does not comply with the explicit substantive requirements of the DMCA or qualify for either the section 512(c) ("information storage") or (d) ("information location tool") safe harbors.

### 1. Deficiencies In Notice Procedures

Both the section 512(c) and (d) safe harbors governing information storage and connecting activity, such as link and search engines, respectively, contain parallel notification and counter-notification requirements in an attempt to balance the duties of service providers, the rights of copyright owners and the rights of other users. In general outline, the notice and take-down provisions work as follows:

1) A copyright owner must contact the service provider and provide written notice meeting certain criteria, *see* 17 U.S.C. § 512(c)(3);

2) If the notice fails to fully comply with the stated notice requirements, but substantially complies with three requirements aimed at identifying infringing sites, works and users, the service provider must promptly attempt to contact the person complaining or takes other reasonable steps to assist in the receipt of notification that complies with the requirements,[25] *see* 17 U.S.C. § 512(c)(3)(B);

3) Once notice is received, the service provider must expeditiously remove or disable access to the material and must notify the affected user promptly, *see* 17 U.S.C. § 512(c)(1)(B);

4) The affected user may then submit a counter-notification consisting of a statement, under penalty of perjury, that the user had a good faith belief that the material was removed as a result of a mistake or misidentification of the material, *see* 17 U.S.C. § 512(g)(3); and

5) Upon receiving a counter-notification, the service provider has 10–14 days to replace the material unless the provider's designated agent receives notice that the complaining party has filed a court action, *see* 17 U.S.C. § 512(2)(C).

### i. Deviations From Notice Requirements

Cybernet's procedures depart from this statutory scheme in several quite significant ways. First, Cybernet's policy states that it requires a complaint to meet all its stated notice requirements and there is no indication that Cybernet tries to work with parties whose notice falls within the stat-

---

**25.** The Court is inclined to read this "or" in the non-exclusive sense.

ute's notice-saving clause, section 512(c)(3)(B)(ii). Second, and even more problematic, Cybernet has altered the notice requirements themselves. Whereas section 512 states "if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site" must be provided, 17 U.S.C. § 512(c)(3)(A), Cybernet does not appear to allow such a *representative* list, and it requests only the specific web page at which a given work is located, rather than the site. These apparently small differences might seem innocent enough, but in the framework of this litigation it appears to be an intent to upset the Congressionally apportioned burden between copyright holder and service provider by placing the entire burden on the copyright owner. These differences, combined with the failure to show any flexibility on its policy that a notification meet all of Cybernet's standards, leads the Court to conclude that Cybernet has failed to structure a notice system that complies with section 512.

### ii. Deviation From Counter–Notification Requirements

The conclusion above is reinforced by Cybernet's counter-notification requirements. The DMCA's counter-notification statement, with its good-faith requirement stated under penalty of perjury, separates good-faith infringers and innocent users from those who knowingly infringe copyrights. *See* 17 U.S.C. § 512(g)(3). This requirement implicates the "reasonably implemented" policy of § 512(i) because there is an implication that a party who cannot sign the required statement is a knowing infringer. Thus, the counter-notification procedures appear to serve the generally self-policing policy that section 512 reflects. Cybernet's counter-notification procedures allow knowing infringers to sidestep this requirement.

By stating under penalty of perjury that they removed the named infringing material, a knowing infringer will be reestablished on the Adult Check system. *See* Zadeh Decl., Ex. 1 at 23. On the one hand, this makes sense to the extent that Adult Check can only disable individual pages or sites because it cannot directly access the content. On the other hand, this also allows Cybernet to reinstate an infringer without the Congressionally-required statement and provides cover for Cybernet to water down its termination policy by treating these minimalist takedown statements as neither an admission nor a denial of the copyright infringement allegations, regardless of how blatant the infringement might be. Although there is no evidence on this issue, the record before the Court provides substantial evidence of resistance on Cybernet's part towards addressing copyright violations by its "unruly" webmasters. The DMCA is a carefully-balanced, although sometimes unclear, piece of legislation. *See Ellison*, at 1066 n. 16.[26] Cybernet's DMCA "variant" appears to upset that balance.

---

**26.** The differences between 512(a) and (c), particularly section 512(a)'s lack of any takedown requirement and its limitation of injunctive relief to banning users may be traceable to its language limiting the safe harbor to those situations where "no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing or provision of connections." *Cf. Religious Technology*, 907 F.Supp. at 1370, 1375 (rejecting direct liability theory based on eleven day storage, but allowing contributory liability theory to go to jury); *cf. also* 17 U.S.C. § 512(n) ("Subsections (a), (b), (c), and (d) describe separate and distinct functions" but failure to qualify for one safe harbor "shall not affect a determination of whether that service provider qualifies for the limitations" under other categories). Thus, (a) and (c) might be read as the difference between basic infrastructure transmission functions and storage functions, with some service provid-

## 2. Direct Financial Benefit and Right and Ability to Control

Both relevant sections exclude from the safe harbor service providers that "receive a benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B), (d)(2). Here, there is significant evidence that Cybernet receives a direct financial benefit. *See supra.*

In *Costar,* 164 F.Supp.2d at 704–05, the district court found that a real estate website, which charged the same price to infringing and non-infringing users and did not charge for the service where the infringement was found, did not receive a sufficiently direct benefit to fall within the statute. *Id.* In so concluding, the Court distinguished the *Fonovisa* line of cases discussed previously by looking to the slightly different language of the statute ("does not receive a financial benefit directly attributable to the infringing activity") and, once again, the legislative history of the DMCA. *See id.* at 705.

This legislative history states:

In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one. In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service.... It would however, include any such fees

ers engaging in both at the same time. *But see Ellison,* at 1066–67 (C.D.Cal.2002)(adopting different interpretation).

27. *See LA Gear, Inc. v. E.S. Originals, Inc.,* 859 F.Supp. 1294, 1301 (C.D.Cal.1994). Al-

where the value of the service lies in providing access to infringing material. H.R Rep. 105–551(II), at 54.

The *Costar* court looked at the fact that neither infringing nor non-infringing users paid anything for the service and concluded that the direct financial benefit was lacking. *Id.* at 705. The Court expresses no opinion on the question whether the "directly attributable" language is narrower or equivalent to the general vicarious infringement requirements. Rather, the direct flow of income to Cybernet based on the number of new Adult Check users that sign up to Adult Check from infringing sites establishes that direct relationship. *See supra.* The more new visitors an infringing site attracts, the more money Cybernet makes. This is quite different from the situation in *Costar* where the site made money on other services it offered, which were not directly tied to the infringing activity. *See* 164 F.Supp.2d at 704. Applying the common-sense, fact-based approach, the Court finds that the financial benefit is highly likely to be sufficiently direct to work against Cybernet's reliance on the safe harbor.

Similarly, with regard to the right and ability to control, the Court agrees with the *Hendrickson* and *Costar* courts that closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme. *See Hendrickson,* 165 F.Supp.2d at 1093–94; *Costar,* 164 F.Supp.2d at 704. As mentioned earlier, section 512 is meant to encourage some level of copyright enforcement activity by service providers, not to punish it. In the parlance of contributory patent infringement cases dealing with the intent requirement for contributory liability of trademark licensors, there must be "something more." [27] Here Cybernet

though the Court recognizes the contexts are very different—one dealing with intent, one with control—this indefinite language trying to identify when there is sufficient involvement to infer either, adequately captures the nature of the inquiry.

prescreens sites, gives them extensive advice, prohibits the proliferation of identical sites, and in the variety of ways mentioned earlier exhibits precisely this slightly difficult to define "something more."

This combination of financial benefit and ability to control makes it highly unlikely that Cybernet may avail itself of the DMCA safe harbor provisions.

### 3. Failure to Provide Evidence of Expeditious Removal

Additionally, there is no credible evidence presented to the Court that Cybernet has ever *expeditiously* removed infringing material from its system, disabled links, or altered its search engine under its variant of the DMCA policy. Thus, this lack of evidence also defeats Cybernet's likelihood of success in trying to fit into the safe harbors.

### 4. Conclusions Relevant to Both Safe Harbors

The Court therefore finds that there is little likelihood that Cybernet will qualify for either the information location tool or information storage safe harbors.

### 5. Copyright Infringement Conclusion

Based on the previous discussion, the Court concludes that Perfect 10 has established a strong likelihood of success for its claims that Cybernet is liable for contributory and vicarious copyright infringement, and has a strong likelihood of showing Cybernet cannot avail itself of section 512's safe harbors. There is, however, a residual chance that Cybernet will qualify for 17 U.S.C. § 512(d)'s safe harbor for search engines, but not links.

---

**28.** In light of its conclusions below, the Court need not address the "fraudulent" arm of the

### B. Likelihood of Success on Unfair Competition Claims

Perfect 10's unfair competition claims under California Business & Professions Code § 17200 ("section 17200") primarily descend from allegations concerning various rights of publicity. Perfect 10 argues these claims implicate both the "unlawful" and "unfair" prongs of section 17200.[28] *See Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 181, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999)(discussing various prongs of unfair competition statute). These rights of publicity claims are asserted on behalf of two groups, Perfect 10 models who have assigned their publicity rights to Perfect 10, and other unaffiliated persons, primarily celebrities.

### 1. Rights of Publicity—Perfect 10 Models

 California recognizes two causes of action based on rights of publicity. The first is a common law right that has been recognized since 1931. *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 408, 114 Cal.Rptr.2d 307 (Cal.App.2001). The elements of this right are:

1) the defendant's use of the plaintiff's identity;

2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise;

3) lack of consent; and

4) resulting injury.

*Id.* at 409, 114 Cal.Rptr.2d 307. The common law right also requires that this right "be balanced against the public interest in the dissemination of news and information consistent with the democratic processes

statute.

under the constitutional guaranties of freedom of speech and of the press." *Id.* (citations omitted).

■ In addition, California has a statutory right, codified at California Civil Code § 3344 ("section 3344"). Section 3344 provides:

> Any person who knowingly uses another's name ... photograph, or likeness, in any manner, on or in products, merchandise, or goods, ... without such person's prior consent, ... shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ.Code § 3344. For purposes of the statute, a use of a name, image and likeness in connection with any news or public affairs broadcast does not constitute a use for which consent is required. Cal. Civ.Code § 3344(d). Additionally, the section does not apply to the owners or employees of any medium used for advertising, unless the owners or employees have knowledge of an unauthorized use. Cal. Civ.Code § 3344(f).

Neither party contests that third parties operating under the Adult Check name have infringed the rights of publicity assigned to Perfect 10 by a number of models. Nor does either party suggest that direct liability would not be appropriate against those third-parties under either theory. Similarly, Perfect 10 does not assert any direct liability theory against Cybernet. The likelihood of success thus boils down to a question of "aiding and abetting."

### a. Could Aiding and Abetting Liability Exist?

■ California has adopted the joint liability principle laid out in the Restatement (Second) of Torts § 876.[29] Under the Restatement,

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he:
> a) does a tortious act in concert with the other in pursuit to a common design with him, or
> b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement so to conduct himself, or
> c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876.

Cybernet argues that there is no case directly recognizing the applicability of this doctrine to the right of publicity torts. Opp'n at 28. The Court finds this argument unpersuasive, as the Restatement provides a background principle for all tort liability in the state of California. *See Saunders,* 27 Cal.App.4th at 846, 33 Cal. Rptr.2d 438.

■ Nor does the Court find convincing Cybernet's argument that the right of publicity itself contains an actual knowledge requirement. Opp'n at 28. Cybernet's citations refer to the requirement that broadcasters of advertisements must have actual knowledge before they can be held liable. *See* Cal. Civ.Code § 3344(f).

---

**29.** *See Pasadena Unified School Dist. v. Pasadena Fed. of Teachers,* 72 Cal.App.3d 100, 113, 140 Cal.Rptr. 41 (1977), *overruled on other grounds, City & County of San Francisco v. United Ass'n of Journeymen & Apprentices,* 42 Cal.3d 810, 812, 230 Cal.Rptr. 856, 726 P.2d 538 (1986)(as general principle for intentional torts); *Saunders v. Superior Court,* 27 Cal. App.4th 832, 846, 33 Cal.Rptr.2d 438 (1994)(as principle for unfair competition claims).

Cybernet does not claim to be a medium used for advertising, and the Court only focuses on rights of publicity infringements located on the websites, not infringements associated with webmaster banner ads. Rather, Cybernet argues that the knowledge requirement of section 3344(f) is a requirement for "aider and abettor" liability under the statute.

The Court concludes otherwise. Although section 3344(f) provides clear evidence that secondary liability can be imposed for violations of publicity rights, it also provides evidence that the California legislature created a heightened knowledge requirement limited to broadcasters of advertisements. *See, e.g., TRW, Inc. v. Andrews,* 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)(applying the "expressio unius est exclusio alterius" canon). The California legislature has not extended this requirement to defendants like Cybernet. *Cf. Newcombe v. Adolf Coors Co.,* 157 F.3d 686, 694 (9th Cir.1998)(allowing claim to proceed against company and ad agency where another artist created work). The Court therefore defaults to the background assumption that secondary liability applies to right of publicity claims and it is to be found in conformance with the requirements established in the Restatement.

**b. Is Secondary Liability Likely to Exist?**

 Perfect 10 has primarily focused its secondary theory of liability on the second branch of the Restatement, requiring actual knowledge of the tortious conduct and substantial participation. Mot. at 32–35. The Court agrees with Perfect 10 that there is a serious question on the merits of the substantial participation prong. As it stands, in the absence of argument to the contrary, the Court looks to the contributory infringement framework of copyright trademark law, where it has already found just such participation, thus leading the Court to conclude Perfect 10 has established a strong likelihood of success with regard to Cybernet's substantial participation. *See supra.* The Court recognizes, however, that the substantial participation requirement has not been a particular subject of discussion among the California courts, and the parties have not done more than refer to the issue in passing.[30]

Perfect 10 also points to the notification it provided Cybernet covering rights of publicity being violated by websites in the Adult Check network. Mot. at 35. In response Cybernet argues perfunctorily that Perfect 10 has not shown that the *owners* of Cybernet had knowledge of the unauthorized use of Perfect 10 model images. Opp'n at 28. The Court fails to grasp the significance of the owners' knowledge absent an assertion that Cybernet is an advertising medium, an assertion that the present record would not support. As to Perfect 10 carrying its burden to show actual knowledge, the Court finds that the notification provided Cybernet by the Second Amended Complaint, especially when supplemented by the physical examples of alleged violations provided in a July 12, 2001 letter to Cybernet's counsel, *see* Mausner Decl., Ex. 47, filed In Support of Pl. Opp'n to Mot. to Dismiss, Aug. 9, 2001, is enough to create a strong likelihood that Perfect 10 will prevail in showing actual knowledge on Cybernet's part.

The Court finds the likelihood of success with regard to both elements of the Restatement test creates a strong likelihood that Perfect 10 will succeed on its unfair competition claim to the extent it predicates liability on an aiding and abetting theory for the violation's of Perfect 10's rights of publicity.

---

**30.** The Court thus reserves the right to revisit this issue at a later time.

### 2. Secondary Liability for Violating the Rights of Publicity of Other Celebrities

Perfect 10 has also argued that Cybernet violates the publicity rights of third-party celebrities by tolerating the presence of fake nude pictures that either claim to be actual pictures of these celebrities or that advertise themselves as "fakes." Mot. at 31.

#### a. Standing

In an earlier order, the Court found that Perfect 10 had adequately pled constitutional standing to assert these rights under the unfair competition statute. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 167 F.Supp.2d 1114, 1125 (C.D.Cal.2001). Then, in a subsequent order, the Court addressed the prudential limitations on standing by reading Perfect 10's complaint as one directed primarily at protecting its own interests and not necessarily vindicating the rights of third-parties. *See* Motion Granting in Part and Denying in Part Second Motion to Dismiss at 21 ("2d MTD Order"). This running battle over standing continues in the present motion.

 Cybernet argues that Perfect 10 lacks standing because it is not a competitor of Adult Check. Opp'n at 32. Cybernet makes this argument by mischaracterizing the plain language of Perfect 10's contentions in a state court action. *See* Jenal Decl., Ex. A at 7 (state court brief). This parallel case concerned Perfect 10's access to former Cybernet employees, presumably contacted for purposes of investigating the facts underlying this action.

Cybernet does not quote the relevant language in full in its papers, but it does assert that "As a factual matter, Perfect 10 admits it is not Cybernet's competitor." Opp'n at 32. The Court finds that, as a factual matter, this is simply incorrect.

The unquoted portion of the brief states:

The fact that Perfect 10 does not compete against Cybernet for the purpose of trade secret law *does not mean that Cybernet cannot be sued by Perfect 10 in the federal action for unfair competition* [.] Cybernet permits and assists its Adult Check Websites to steal photos and images from Perfect 10 magazine and <www.perfect10.com> and unlawfully display those photos and images. It also provides consumer access to that stolen property for a fee.

Jenal Decl., Ex. A at 7 (emphasis added).

The Court finds this mischaracterization to be fairly blatant and it plays into the Court's concerns over the credibility of Cybernet's declarants.[31] Moreover, the Court has concerns about Cybernet playing "fast and loose" with its assertions, and warns Cybernet that judicial estoppel is a doctrine that may not work to its benefit.

Turning to the merits, Cybernet and Perfect 10 both compete for consumers' adult entertainment viewing dollars. They both peddle images on the web in an industry where, by Cybernet's own admission, price counts. The Court finds this is a strong indication of competition, particularly where Adult Check webmasters attract consumers using Perfect 10's own

---

**31.** In the interest of fairness, the Court notes that Perfect 10 has also on occasion been known to adopt strained readings in support of its position. *See* Mot. at 22 (reading Cybernet's instructions to webmasters to "sell sizzle, not steak" as advice to show improper pictures to prospective customers before they log onto Adult Check). Nevertheless, Cybernet has shown a much greater tendency to make assertions that simply cross the line of credulity. *Compare* First Mot. to Dismiss at 13 ("Quite frankly, given the nature of the entertainment business, it would seem that there is no such thing as bad publicity for these kinds of people [referring to celebrities.]") *with* Rudolph Decl., Ex. A, filed Dec. 3, 2001 at 9–10 (graphic depiction of pop star in digitally-altered "action shot").

material. *Cf. Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1063–65 (9th Cir.1999) (discussing initial interest confusion). Because the record supports a finding of competition and Cybernet has raised no other arguments, the Court finds that Perfect 10 has met Cybernet's current standing challenge.

### b. Likelihood of Success—Third Party Rights

As this again disposes of the standing issues raised by the parties, the Court then turns to the question of Perfect 10's likelihood of success when it comes to third-party rights of publicity. There are two relevant classes of celebrities—those that have complained to Cybernet and those that have not. Mindful of the prudential limitations on standing despite Perfect 10's status as Cybernet's competitor, *see Viceroy Gold Corp. v. Aubry,* 75 F.3d 482, 488 (9th Cir.1996), the Court concludes that Perfect 10 only stands a likelihood of success on its claims of unfair competition for those celebrities who have already complained to Cybernet about unauthorized uses of their publicity rights.[32]

The Court finds that there are indeed celebrities who have complained to Cybernet about uses of their images. *See* Milano Decl. Cybernet has not made any argument that it has taken any actions to remove these offending images or sites from its service. This combination of actual knowledge, acceptance of the benefits from these sites, and lack of action, if proved at trial, which the Court finds likely, would expose Cybernet to aiding and abetting liability for these celebrity images as well. *See supra.* Limited to those celebrities who have complained about use of their images and identities, the Court therefore finds a strong likelihood that Perfect 10 will succeed on its claim against Cybernet based on the violations of third-party celebrities' publicity rights. This predicate act also provides a strong likelihood of success for Perfect 10's unfair competition claim.

### 3. Ultimate Likelihood of Success on Unfair Competition Claim

The Court concludes that the likelihood of success on these right of publicity claims creates a high likelihood of success on both the "unlawful" and "unfair" prongs of California's unfair competition statute. *See* Cal. Bus. & Prof.Code § 17200; *see also Sun Microsystems, Inc. v. Microsoft, Corp.,* 87 F.Supp.2d 992, 999 (N.D.Cal. 2000) (discussing similar competitive injury sufficient to meet "unfair" prong as "incipient violation of antitrust laws"); *Cel–Tech,* 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (discussing "unlawful" prong).

The Court recognizes that application of secondary liability principles is particularly applicable for claims of unfair competition, as the California Supreme Court recognized as far back as 1935: "When a scheme is evolved which on its face vio-

---

**32.** The Court finds the differences in proof between those who have complained and those who have not will strongly effect the likelihood of success. Further, this ensures that there is a sufficient unity of interest and that the use of any image is truly "unfair" and/or "unlawful." *See Viceroy Gold,* 75 F.3d at 488 (goal of third-party standing is to avoid adjudicating rights a third-party might not wish to assert and to ensure effective advocacy). To the extent third-party standing is implicated, both goals recognized in *Viceroy* are met once a person has complained about use of their image. Although the relationship between Perfect 10 and those who have complained is not close, based on the evidence before the Court, their interests align and the ability of these third-parties to assert their rights is severely hindered by the architecture of Cybernet and the internet. This is evidenced by the large investment of time and resources devoted by Perfect 10 to identifying individual images and sites for this litigation.

lates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate the consummation because the scheme is an original one." *American Philatelic Soc'y v. Claibourne*, 3 Cal.2d 689, 698–99, 46 P.2d 135 (1935).

In *American Philatelic*, a purveyor of stamps altered his normal stamps to resemble rare perforated stamps. *Id.* at 692, 46 P.2d 135. He then sold these stamps to stamp dealers with clear notice that the stamps were not of the rare variety. *Id.* at 694, 46 P.2d 135. Nevertheless, his sales brochures and pricing established that he both anticipated and effectively encouraged these dealers to sell the stamps to the public as rare stamps. *Id.* The California Supreme Court had no problem finding these claims stated a claim under the unfair competition law. *Id.* at 697, 46 P.2d 135. *Saunders, American Philatelic*, and *Cel–Tech's* quotation of *American Philatelic's* equity language reinforce the Court's conclusion that Perfect 10's theory of aiding and abetting liability for Cybernet based on third-party violations of various rights of publicity has a strong likelihood of success.[33]

## C. TRADEMARK INFRINGEMENT

### 1. Elements of Trademark Infringement

In order for Perfect to prevail on its trademark claim Perfect 10 must show:

1) that a mark is owned and associated with Perfect 10; and

2) the defendants' use of the mark is likely to cause confusion or mistake among the general public.

*Sega Enterprises, Ltd. v. MAPHIA*, 948 F.Supp. at 936.

### 2. Perfect 10's Trademark and Service Mark

■ Perfect 10 has brought forward its trademark and service mark registration certificates. Mausner Decl., Ex. B at 59, 62. This is *prima facie* evidence of the validity of the trademark, Perfect 10's ownership of the mark, and its exclusive right to use the mark. 15 U.S.C. § 1057(b). At the same time, Perfect 10 has asserted that it has trademark rights in the names of its models, but has not adequately established this fact.[34] *See* Mot. at 10. The Court therefore restricts its discussion to the "Perfect 10" trademark.

### 3. Direct Infringement—Standards

Perfect 10 advances two theories of trademark infringement that it claims are widespread on the Adult Check websites: unauthorized usage of its actual trademark and reverse palming off. Mot. at 39.

■ Section 1114 of the Lanham Act prohibits the use of "any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any good for services or in connection with such use [when such use] is likely to cause confusion." The statute is intended to protect consumers against

---

**33.** The Court finds *Emery v. Visa Int'l Serv. Assoc.*, 95 Cal.App.4th 952, 116 Cal.Rptr.2d 25 (2002), is not applicable to the present situation. In *Visa* the alleged unfair practice involved a duty to investigate the truth of statements made by others—a duty specifically defeated by California case law, Visa's lack of control, and an alleged unlawful act that involved a violation of California's Penal

Code. Cybernet's power to police extends much farther than the policing of one's mark referred to in *Visa* and the predicate acts are based on civil doctrines of liability.

**34.** Perfect 10 has produced assignments of "any" trademark rights owned by the models, but has failed to present any evidence that they had trademark rights to give.

deceptive designations of the origin of goods, as well as preventing the duplication of trademarks. *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 899 (9th Cir. 1997). Direct usage of a mark by unauthorized users can lead to the public's belief that the mark's owner sponsors or otherwise approves of the use of the trademark. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir.1979). This can satisfy the likelihood of confusion and can justify a court granting injunctive relief. *See id.* at 204–205.

 Reverse passing off occurs when someone markets a product as their own, although the product was created by someone else. *See Summit Machine*, 7 F.3d at 1437, 1441. This doctrine has been limited to situations of bodily appropriation. *Shaw v. Lindheim*, 919 F.2d 1353, 1364 (9th Cir.1990).[35] Bodily appropriation is defined in the copyright context as "copying or unauthorized use of substantially the entire item." *See Cleary v. News Corp.*, 30 F.3d 1255, 1261 (9th Cir.1994). In the context of reverse palming off, this definition is useful because it recognizes that slight modifications of a product might cause customer confusion, while products which are merely generally similar will not. *Id.*

### 4. Direct Infringement—Likelihood of Success

 Perfect 10 has brought forward evidence that a number of Adult Check webmasters engage in both forms of trademark infringement. The Court therefore finds that there is a strong likelihood that Perfect 10 will establish direct infringement by individual Adult Check webmasters.

### 5. Contributory Infringement

 Perfect 10 does not maintain that Cybernet has directly infringed its trademark. Rather, it relies on a theory of contributory liability. Contributory liability may be imposed where the defendant: (1) intentionally induces another to infringe on a trademark or (2) continues to supply a product knowing that the recipient is using the product to engage in trademark infringement. *Fonovisa*, 76 F.3d at 264. Perfect 10 does not argue that Cybernet intentionally induced the infringement and Cybernet correctly points out there is no evidence of such intentional inducement. Opp'n at 29. This brings the Court to the second method of establishing contributory infringement.

 The Ninth Circuit has recognized that courts must consider the extent of control exercised by a defendant over a third-party's means of infringement when dealing with the second test and the fact pattern does not fit well into the "product" mold. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir.1999). Thus direct control and monitoring of the instrumentality used by a third-party to infringe the plaintiff's mark can lead to liability. *Id.* These considerations are similar, if not completely equivalent, to the principles applicable in the copyright context. *See Fonovisa*, 76 F.3d at 265.

Although trademark liability is more narrowly circumscribed than copyright liability, similar principles underlie contributory trademark infringement. *See Fonovisa*, 76 F.3d at 265. This second test can be met where one knows or has reason to know of the infringing activity, and it spe-

---

**35.** The considerations under California state law for reverse palming off are the same as they are for reverse palming off under the Lanham Act. *See Summit Machine*, 7 F.3d at 1441–42.

cifically covers those who are "willfully blind" to such activity. *Id.*

Cybernet maintains that there is no evidence that Cybernet had knowledge of the trademark infringement. Although the evidence is not as clear cut as Cybernet maintains, Perfect 10 does not contest the point. The Court therefore declines to express a view on the strength of Perfect 10's evidence with regard to contributory trademark infringement.

### 6. Trademark Conclusion

Because Perfect 10 has insufficiently asserted its argument against Cybernet for trademark infringement, the Court declines to find a strong likelihood of success at this point.

### D. CONCLUSIONS—LIKELIHOOD OF SUCCESS

Perfect 10 has:

1) not established a strong likelihood of success on its direct copyright infringement claims against Cybernet;

2) established a strong likelihood of success on its contributory infringement claims against Cybernet;

3) established a strong likelihood of success on its vicarious infringement claims against Cybernet;

4) established a strong likelihood of success on its unfair competition claims against Cybernet based on rights of publicity assigned to Perfect 10;

5) established a strong likelihood of success on its unfair competition claims against Cybernet based on violations of third-party rights of publicity where those third-parties have complained to Cybernet about use of their images or identities by affiliated Adult Check webmasters;

6) has not established a likelihood of success on its trademark claims against Cybernet.

## VII. UNCLEAN HANDS?

■■■ Cybernet contends that even if the Court could find that Perfect 10 has raised serious issues or a strong likelihood of success over its various claims, the Court should deny injunctive relief because of Perfect 10's "unclean hands." Opp'n at 38–39. The unclean hands doctrine may apply when the alleged misconduct occurs in a transaction directly related to the matter before the court and the conduct affects the equitable relationship between the litigants. *Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354, 1376 (E.D.Cal.1995).

■■■ Cybernet points to two websites, www.celebshop.com and www.celebritypictures.com, which contain Perfect 10 advertising banners. Opp'n at 38–39. Both websites, true to their names, contain the same type of pictures that Perfect 10 has fought against so vociferously in this action. Perfect 10, apparently realizing the awkward appearance, confesses that it entered into settlement agreements with several websites after complaining about infringements of Perfect 10 copyrights. Reply at 13; Zadeh Decl. II ¶ 13; Mausner Decl. II ¶¶ 8–14. According to these agreements, the sites would provide for banner advertising as part of the settlement terms. At the time, Perfect 10 claims it did not realize the unfair competitive advantage these types of sites had over its operation. Zadeh Depo. at 310–11.

The Court finds Perfect 10's basic explanation credible. Although these agreements do tarnish Perfect 10's crusading stance, they do not alter the strength of its arguments. Moreover, Cybernet's argument implies that the best solution to illicit behavior in an industry that appears to be rife with it, is to ignore it when the plaintiff appears sullied, too. The Court finds that there is a strong public interest in

protecting intellectual property rights, and that the better solution is to bring parties into conformance with the law's dictates. The Court is also quite cognizant of the harms being inflicted on other third parties when policies that encourage pirating behavior of this kind are left unchecked. Although Perfect 10's hands are not "clean as snow," the Court finds the strength of its case and the public interest make this issue one better left to trial and finds it insufficient to justify denying injunctive relief. *See GoTo.Com v. Walt Disney Co.,* 202 F.3d 1199, 1209–10 (9th Cir.2000); *EEOC v. Recruit U.S.A., Inc.,* 939 F.2d 746, 753 (9th Cir.1991).

## VIII. IRREPARABLE HARM

Cybernet makes three major arguments attacking Perfect 10's showing on the issue of irreparable harm. First, Cybernet invokes the doctrine of laches and argues that this defeats any inference of irreparable harm. Opp'n at 16–17. Additionally, Cybernet maintains that Perfect 10 has failed to establish a sufficient likelihood of success on its claims to entitle it to the presumption of irreparable harm granted to those who make a strong showing of copyright infringement or unfair business practices. *Id.* at 16. Finally, Cybernet contends Perfect 10 has failed to show irreparable harm. *Id.* at 17. The Court will address each contention.

### A. LACHES

■ Perfect 10 filed its complaint on March 20, 2001, served Cybernet in May, 2001 and filed the present motion on January 7, 2002. Cybernet argues that the nine month period from March until January defeats any inference of irreparable harm. Opp'n at 16–17. The Court does not agree. Perfect 10 points to the need for discovery and the stonewalling of Cybernet as reasons for the delay. Reply at 20–21. The Court find these explanations to be adequately supported by the record.

They are strengthened by the constant stream of motions in the case, including three motions to dismiss and the multiplicity of theories in the case, which may have reasonably delayed the proceedings. *See Tough Traveler, Ltd. v. Outbound Prod.,* 60 F.3d 964, 968 (2d Cir.1995). Further, there is no harm to plaintiff from the delay. *Cf. Ocean Garden Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 508 (9th Cir.1991) (six months, no laches, no harm to plaintiff). If anything, the gap should have provided Cybernet with sufficient time to evaluate its systems, and put in place a program designed to adequately address its potential liability. The Court thus finds the nine month delay between the filing of the complaint and the filing of this motion is not sufficient to raise the laches bar. *Cf. Napster I,* 114 F.Supp.2d at 900 (granting preliminary injunction nine months from the date complaint filed).

### B. PERFECT 10'S FAILURE TO SHOW A SUFFICIENT LIKELIHOOD OF SUCCESS

■ In copyright and unfair competition cases, irreparable harm is presumed once a sufficient likelihood of success is raised. *See Micro Star v. Formgen, Inc.,* 154 F.3d 1107, 1109 (9th Cir.1998) (copyright); *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n. 3 (9th Cir.1989) (unfair competition). Cybernet's contention that Perfect 10 has failed to show a sufficient likelihood of success to raise this presumption must fall as to the claims for which the Court has already concluded otherwise. Thus, irreparable harm may be presumed.

### C. EVIDENCE OF PERFECT 10'S IRREPARABLE HARM

■ The Court need not rest on the presumption of irreparable harm, however. Cybernet argues that Perfect 10 has failed

to provide any evidence of harm, *see* Opp'n at 17–18, but the Court finds the record justifies the conclusion that Perfect 10 will suffer irreparable harm. Perfect 10 and Adult Check are competitors. Adult Check is the largest AVS on the web and services approximately 2 million users each day. A significant number of the sites that attract these users and their funds utilize Perfect 10's copyrighted works, the images of celebrities who have complained about the use of their likenesses, or a combination of both, superimposing celebrities onto the bodies of Perfect 10's models. These sites charge less than Perfect 10, and Adult Check appears to contain more of Perfect 10's images than Perfect 10 itself owns. Cybernet's efforts to show the poor success of Perfect 10 reinforce this. Perfect 10 loses approximately $4 million to $5 million dollars per year. Just a small shift in the viewing habits of Adult Check's millions of users would have a significant effect on Perfect 10's bottom line. All told, the large losses being sustained by Perfect 10, suffered in this competitive context, justify a finding of irreparable harm.

## D. BALANCE OF HARDSHIPS

 The Court finds that the balance of hardships weighs significantly in favor of plaintiff, further justifying a grant of injunctive relief. Based on the evidence before the Court it appears that Cybernet profits from the infringing and unlawful activities of its webmasters without shouldering any of the undesired burdens associated with protection of intellectual property rights. The Court finds this willful blindness harms Perfect 10, defeats the rights of third-parties who find themselves displayed on these sites against their will,

and skews the online adult market. Perfect 10 has already spent an inordinate amount of time researching these infringements, forced to pay a competitor in order to discover the infringing images on the Adult Check system.[36] Cybernet is not only in position to exercise its ability to control the content of the system—it already does when it suits its financial interests. Moreover, the tolerance of pirating behavior by the country's largest AVS system harms the public by rewarding illicit behavior. The balance of hardships favors Perfect 10 and favors injunctive relief.

The Court will therefore GRANT Perfect 10's motion for a Preliminary Injunction. The Court does not, however, agree with Perfect 10's proposed terms.

## X. TERMS OF THE INJUNCTION

Although the Court has concluded that Perfect 10 is entitled to injunctive relief, there are goals that must be kept in mind in crafting the scope of relief:

1) preventing future infringement;

2) preventing continuing infringement;

3) encouraging the cooperative system envisioned by Congress;

4) consistency with the statutory framework discussed above; and

5) striking the right balance between protecting intellectual property rights and avoiding unduly burdensome requirements on Cybernet and its users.

Evaluated against these goals, Perfect 10's proposed order suffers from some shortcomings. The Court therefore has modified the proposed injunction. At the hearing, both parties had questions and

---

**36.** The Court observes that the operations of the Adult Check system, with Cybernet's service understandably preventing unfettered access, also works to prevent various intellectual property rights holders from effectively protecting their rights. This situation poses a difficult challenge to section 512's accommodation of "standard technical measures" where it is unclear that any such standard has been developed.

concerns over the Court's proposed injunction. The Court addresses the most salient points now.

During the hearing, Cybernet requested clarification on the scope of the first paragraph. This first paragraph covers websites directly operated by the defendants.

Additionally, Cybernet raised several objections to the Court's imposition of affirmative duties to search through its system for infringing material. First, Cybernet argued that these duties require more than the bare minimums of the DMCA. The injunction does require more than the bare minimum of the DMCA, but these affirmative duties are justified by the Court's scepticism that Cybernet can ever qualify for the DMCA's safe harbor provisions because of the DMCA's vicarious liability provisions.[37] Moreover, assuming Cybernet may eventually be entitled to take advantage of the safe-harbor provisions, the affirmative requirements of the injunction ensure that its prior disregard of copyrights is cured.

Second, Cybernet also objected that the injunction overall is too burdensome. The Court disagrees. The injunction simply requires Cybernet to utilize its current site review function to a) remedy past tolerance of infringing activity and b) prevent infringers from joining the Adult Check family. The injunction orders Cybernet to treat copyright protection and respect for rights of publicity as elements of its business model that are equally as important to Cybernet as currently are the color, layout, prevention of certain content, and prevention of over-saturating use of celebrities. It is no more burdensome than the injunction granted in *Napster*, and falls

significantly short of the shut-down order the Ninth Circuit recently upheld. *See Napster III*, 2001 WL 227083 at *1; *Napster IV*, 284 F.3d 1091, at 1098–99.

Cybernet's argument, however, does have validity in light of Perfect 10's apparent belief that the injunction's terms create a strict liability for *any* infringing images found on the Adult Check sites. Perfect 10's reading of the injunction is incorrect. Cybernet has an affirmative duty as set out in the injunction, but the Court recognizes that not every violation of copyright or rights of publicity will be caught.

Instead, the injunction requires Cybernet's reviewing staff to take action against sites containing images which a *well-trained* site reviewer should catch. The adoption of a DMCA-compliant plan is meant to ensure the removal of infringing images that make it through the reviewers' initial screening of websites. The knowledge requirement goes beyond the DMCA's "red flag" test, however, because previous enforcement efforts suggest a strong tendency on Cybernet's part to enforce no more than it perceives to be the minimal requirements imposed upon it. The Court may revisit this issue if substantial questions of compliance with the injunction or burden issues arise, but it must be stressed that the injunction, like the DMCA, creates a framework where all but the most difficult issues should be resolvable without the Court's intervention.

Third, Cybernet requested a multi-million dollar bond, but the Court concludes that a $600,000 bond is sufficient. The

---

37. *See supra; A & M Records, Inc. v. Napster, Inc.*, 2001 WL 227083 *1 (N.D.Cal.2001) (requiring Napster to use "reasonable measures" to identify variations in file names) ("*Napster III* "); *see also A & M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1095–96, 1098–99 (9th Cir.2002) (affirming shut-down order where Napster "failed to prevent infringement of all of plaintiffs' noticed copyrighted works" because "more could be done to maximize the effectiveness of the new filtering mechanism") ("*Napster IV* ").

only requirements of the injunction, beyond the DMCA's requirements or Cybernet's current practice of reviewing sites, are the imposition of a single, thorough review of the Adult Check Gold sites, periodic review of infringing sites, and the training costs for Cybernet's review staff. Assuming a doubling of Cybernet's twelve-employee site review staff coupled with proper training, the Court concludes that such a bond will be sufficient to meet Cybernet's increased costs. The parties should keep in mind that the terms of this preliminary injunction may differ significantly from the terms of any permanent injunction, should Perfect 10 succeed on its claims. The scope of this order is meant to address the situation as it now stands, not as it might exist after a trial of the issues.

Finally, the Court has applied uniform standards in addressing the copyright and right of publicity concerns, despite the differing sources of the rights, because the Court recognizes the similar natures of the two rights insofar as technological limits and notice difficulties inhere in policing their use on the internet.

## XI. CONCLUSION

For the reasons above, Perfect 10's motion for a preliminary injunction is GRANTED.

It is hereby ordered that during the pendency of this action and until final judgment is entered, defendants Cybernet Ventures, Inc. ("Cybernet"), AEI Productions, Inc., Sean Devine, Funet, Inc., F–T–V Corp., F–T–V.net and Vic Toria and their agents, servants, directors, officers, principals, employees, representatives, subsidiary and affiliated companies, assigns, and those acting in concert with them or at their direction (collectively, "Defendants") are enjoined as follows:

1. Defendants shall not do any of the following on or in connection with any

websites individually operated by them: (a) invoke or display the name, likeness or identity of any of the "Identified Celebrities and Models" (as defined in paragraph 9 below); or (b) display, copy or distribute any "Perfect 10 Works" (as defined in paragraph 11 below) or images substantially similar thereto (collectively, the "Prohibited Content").

2. Cybernet shall not include in its search engine or any database any of the Prohibited Content and Cybernet shall not produce any search results of any kind in which the names or identities of the Identified Celebrities and Models are invoked in search requests or queries on its search engine.

3. Cybernet shall not permit access to any "Identified Website" (as hereafter defined) via links on Cybernet's website or through the use of an Adult Check ID, nor shall Cybernet otherwise permit an Identified Website to use any of Cybernet's computer facilities unless the Identified Website's owner, operator, or agent registered with Cybernet has complied with counter-notification procedures no less stringent than those found in 17 U.S.C. § 512(g) and the website owner is not an appropriately terminated user under a policy complying with 17 U.S.C. § 512(i). Cybernet shall use an identical counter-notification standard for alleged copyright and right of publicity violations. "Identified Website" shall mean any of the following:

(a) Any Adult Check website that Cybernet knows or has reason to know contains any Prohibited Content, unless the website operator produces Rights Documentation (as defined in Paragraph 10 below) for all Prohibited Content or a counter-notification meeting standards no less stringent than those found in 17 U.S.C. § 512(g).

(b) Any Adult Check website identified in Exhibit B to the Third Amended

Complaint, unless the website operator produces Rights Documentation for all Prohibited Content or a counter-notification meeting standards no less stringent than those found in 17 U.S.C. § 512(g).

(c) Any Adult Check website that Cybernet is given or has been given adequate notice that it contains Prohibited Content, unless the website operator produces Rights Documentation for alleged Perfect 10 Works and any content concerning the Identified Celebrities and Models or a counter-notification meeting standards no less stringent than those found in 17 U.S.C. § 512(g).

4. Prior to their addition to the Adult Check network, Cybernet shall review the content of websites to determine whether they contain any Prohibited Content; if the website contains such content and such content is reasonably apparent, or the website specifically disclaims copyright ownership or permission for those images protected by the right of publicity, then it shall not be added to the Adult Check network, unless the website operator produces Rights Documentation for such content.

5. Cybernet shall review on a monthly basis the content of any website that has, at any time, removed content based on right of publicity or copyright allegations without submitting a statement to Cybernet containing at least the information identified in 17 U.S.C. § 512(g), or is operated by a webmaster Cybernet knows or has reason to know has operated a website as described immediately above, in order to determine whether there exists any reasonably identifiable Prohibited Content on that website.

6. Within 90 days of entry of this Order, Cybernet shall review the content of each Gold website in order to determine whether there exists on the website any reasonably identifiable Prohibited Content.

7. Within 90 days of the entry of this Order, Cybernet shall require that each Adult Check Website in Cybernet's celebrity category produce for Cybernet's inspection, a copy of which shall be served on Perfect 10, Rights Documentation establishing its right to display the images of any person who has lodged a complaint with Cybernet about the use of his or her image on Adult Check affiliated websites. Cybernet shall treat any website as an Identified Website if it fails to produce such documentation for all such content.

8. Cybernet shall not include on its website or in promotional materials any statements that the Adult Check websites include images or "fake" images of celebrities for which Cybernet has received notice that the celebrity objects to the use of his or her image unless the reference reasonably reflects content on the websites for which Cybernet can produce Rights Documentation.

9. As used here, "Identified Celebrities and Models" shall mean any person who has assigned to Perfect 10 their right of publicity or any person who has complained to Cybernet about use of their images on Adult Check affiliated websites, in so far as these persons are identified in the Third Amended Complaint in this action, or any content concerning such persons, unless Cybernet can produce Rights Documentation that the particular content is authorized. "Identified Celebrities and Models" also shall include any person identified by Perfect 10 in a written statement delivered to Cybernet's designated agent, such written statement for right of publicity allegations directly asserted by Perfect 10 meeting the substantive requirements of 17 U.S.C. § 512. "Identified Celebrities and Models" shall also include any new person complaining to Cybernet about the use of his or her images on Adult Check affiliated websites. Cybernet shall make

publicly accessible a list of all "Identified Celebrities and Models," identifying their objection to the use of their images on Adult Check affiliated websites.

10. As used herein, "Rights Documentation" shall consist of a written license agreement or consent statement, signed by the person or persons whose images or identity is invoked or the person or persons' authorized agent, authorizing the display of the image on Adult Check websites, or a statement, under penalty of perjury, declaring why the website operator believes the display is authorized.

11. As used herein, "Perfect 10 Works" shall mean any copyrighted image or work of Perfect 10, or any part thereof.

12. Within ten (10) business days of the date of this Order, each of the Defendants shall serve upon plaintiff and file with the Court a report of compliance identifying the steps each has taken to comply with this Order. One hundred days following the date of this Order, Cybernet shall serve upon the plaintiff and file with the Court a further report of compliance identifying the steps it has taken to comply with Paragraphs 6 & 7 of this Order.

This Order shall be effective upon the filing of a bond in the amount of Six Hundred Thousand Dollars ($600,000) by plaintiff.

**IT IS SO ORDERED.**